[Civil No. 4176.   Filed December 23, 1940.]

[108 Pac. (2d) 565.]

D. W. WADDELL and ARIZONA CITRUS LAND CO., a Corporation, Appellants, v. ELVIN E. WHITE, Appellee.

Messrs. Gust, Rosenfeld, Divelbess, Robinette & Coolidge, for Appellants.

Messrs. Woolf & Shute and Mr. W. T. Elsing, for Appellee.

LOCKWOOD, J.—This is an action by Elvin E. White, hereinafter called plaintiff, against D. W. Waddell, hereinafter called defendant, and Arizona Citrus Land Company, a corporation, hereinafter called the land company, for damages for unjust enrichment of defendants at the expense of plaintiff by means of false and fraudulent representations and deceit. The case was tried to a jury which returned a verdict in favor of plaintiff for $37,000, and defendants have brought the matter before us for review.

The complaint is thirty-seven pages in length, and we, therefore, summarize the picture presented thereby in factual form as follows. About October 29, 1932, the land company was the owner of a large acreage lying in what is known as the Beardsley Project, in Maricopa county, Arizona. At this time plaintiff, who had for years been an experienced citriculturist, was the owner of many thousands of budded nursery Marsh seedless grapefruit trees, and other thousands of seedling nursery grapefruit, together with several thousand dollars worth of equipment and machinery used

for planting and caring for such trees. Defendant was the owner of the majority of stock in the land company, and at all times was in full control of it. Most of the land owned by that company was raw and uncultivated desert which it had for some time endeavored to sell, but with little success. Its officers conceived the idea that if it were offered for sale as potential citrus land and they showed prospective purchasers that it had an expert citriculturist, ready to put in trees and care for the land until the trees were in bearing, sales might be promoted. For this reason it contacted plaintiff, and as a result of preliminary negotiations a contract was entered into between it and plaintiff on the date first mentioned. After reciting the inducements of the contract, it was agreed that the land would be offered for sale by the company at $250 per acre; that plaintiff would hold himself in readiness to enter into a nurseryman's contract with all prospective purchasers to plant the land purchased by them to grapefruit trees and to care for them for a period of three years, at the rate of $180 per acre for the first year, $75.24 per acre for the second year, and $75.72 per acre for the third year. The land company agreed that it would sell not less than 100 acres of land carrying this nurseryman's agreement prior to March 15, 1933, or, in case it could not make such sale, that it would enter into a contract with plaintiff, under the terms of the nurseryman's agreement, for the development of sufficient of its own lands to bring the total nurseryman's contracts outstanding at that date to 100 acres. Plaintiff further agreed that he would purchase 80 acres of land on the installment plan, plant 10 acres of it to grapefruit, and establish a nursery thereon for the purpose of supplying prospective purchasers with trees. He began performance under this contract, defendant advancing him the actual cost of his labor and some gaso-

line. By the 15th of March, however, no lands had been sold, and the land company was, therefore, under an obligation to contract with plaintiff to plant and care for 100 acres of its land at the agreed price. On April 7, 1933, a supplemental contract was made. By its terms the land company agreed to advance not exceeding $6,000 to cover the actual expense of planting 200 acres, and to advance the actual cost of care and cultivation of the land, not exceeding $900 per month, until it was sold. In consideration thereof, plaintiff agreed to postpone the annual payments due him under the original contract until the land was sold or three years had elapsed, whichever event occurred first, and to assign any money due him by virtue of these nurseryman's contracts to the land company, until all advances made by it to him should be paid. The effect of this supplemental contract, construed together with the original one, was that plaintiff waived his right to the annual payments on the land planted as provided in the agreements for not exceeding three years, and the land company agreed to advance as against these deferred payments $6,000 for the planting of the 200 acres, and $900 per month for its maintenance until the land was sold, or three years had elapsed. Up to and including this time there is no contention the mutual dealings had not been fair and legal. Defendant then went east and endeavored to sell the land, but failed entirely. Knowing that the land company was bound by its contract to assume a gross liability to plaintiff of many thousand dollars, payable in not more than three years, and to finance plaintiff in his care of the 200 acres of the rate of $10,000 per year for three years, unless the land was sold sooner, defendant evolved a scheme for depriving plaintiff of his rights, as aforesaid. In pursuance of this scheme, on his return from New York in June, 1933, he suggested to plaintiff it would be well that he,

plaintiff and one Avon Brown, one of defendant's employees, should organize another corporation for the purpose of taking over plaintiff's contracts and assets, representing to the latter, among other things, that one of the many obstacles in selling the land was that purchasers did not desire to depend upon an individual, with whom they had no acquaintance, for the planting and care of their land, but would be satisfied to have this work undertaken by a corporation in which defendant, whom they knew and in whom they had confidence, was one of the active and principal stockholders, and that thus the three could make a great deal of money. Believing this and various other representations to which we shall allude as it is necessary from time to time, the Agua Fria Citrus Grove Development Company, hereinafter called the development company, was organized, and 55 per cent. of its stock was issued to defendant, 22 per cent. to Avon Brown, and 23 per cent. to plaintiff who thereupon transferred to the development company the land he had purchased and his nurseryman's contracts as aforesaid, all of his nursery supplies, trees, seedlings and the like, and the machinery and equipment for planting above referred to, which was valued by mutual agreement at $97,000. The development company had five directors, defendant, his daughter, his son-in-law and Brown being four, and plaintiff being the fifth. From that time on the development company took care of the citrus trees set out by plaintiff under his nurseryman's contract, and also farmed certain other lands under a lease from the land company, the latter furnishing all the necessary working funds for this purpose and taking demand notes from the development company which up to June, 1935, amounted to something over $60,000.

In that month defendant called plaintiff in and told him that the development company was insolvent;

that it had no money nor assets even to meet its current payroll, and urged plaintiff to surrender his stock, promising him a "bonus" of $1,500 therefor, but representing that even to pay that much he would have to borrow money from the bank. Plaintiff discussed the situation with the attorney for the development company, and believing from what he knew at the time that this was the best thing to do, accepted the "bonus," surrendered his stock, and all of the assets of the development company were transferred to the land company in cancellation of its notes for advances. Plaintiff then went to work for the land company at· a salary of $200 per month. The ultimate result of the transaction was that the land company in return for its advances to the development company secured all of the assets of the latter, including the planted land, the nursery stock and the amounts due under the various nurseryman's contracts, for the payment of $1,500, while plaintiff had lost all of his original assets and his rights under his nurseryman's contracts.

In March, 1936, plaintiff for the first time discovered that these various manipulations had been carried on as a part of the scheme conceived by defendant in the spring of 1933, as above. He endeavored to secure a settlement of what he believed to be his rights from defendant and the land company, but was unable to do so and brought this action.

■■ The action is based on fraud and deceit. We have set forth the necessary ingredients of a case of this kind in *Moore* v. *Meyers,* 31 Ariz. 347, 253 Pac. 626, 628, as follows:

"The elements of actionable fraud may be stated as follows: (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the man-

ner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury. 26 C. J. 1062. If these factors all appear, a cause of action for fraud will unquestionably exist.''

And it is necessary, of course, that plaintiff should prove all of these essentials. The nature and extent of the proof required depends to a great degree upon the relations existing between defendant and plaintiff. If they were dealing at arm's length, a greater degree of proof is required than if a confidential relation existed between them. It is the contention of plaintiff on this point that a confidential relation did exist, for the reason that the two were joint adventurers for profit in a common cause and, indeed, defendant admits that if this be true, the relationship between them is one of trust and confidence.

■■ It appears from the record that upon defendant's representations to plaintiff that they could jointly make a large profit thereby, that he, plaintiff and Brown organized a corporation and pooled certain of their respective assets, for the purpose of developing and operating certain lands. We think that this situation, if true, and from the verdict of the jury we must believe it found it to be true, did create the relationship of joint adventurers, which lasted at least until the liquidation of the development company. *Carrick* v. *Sturtevant,* 28 Ariz. 5, 234 Pac. 1080; *Miller* v. *Walser,* 42 Nev. 497, 181 Pac. 437; *Saunders* v. *McDonough,* 191 Ala. 119, 67 So. 591; *Re Marvin,* 180 App. Div. 778, 168 N. Y. Supp. 555. Such being the case, it was incumbent upon both defendant and Brown to exercise the utmost good faith to plaintiff in the organization and operation of the corporation which was formed to carry out their joint purpose. As was said in *Botsford* v. *Van Riper,* 33 Nev. 156, 190, 110 Pac. 705, 711:

" . . . We further find that the law is well established that the relation between joint adventurers is fiduciary in its character, and the utmost good faith is required of the trustee, to whom the deal or property may be intrusted, and that such trustee will be held strictly to account to his co-adventurers, and that he will not·be permitted by reason of the possession of the property or profits, whichever the case may be, to enjoy an unfair advantage, or have any greater rights in the property by reason of the fact that he is in possession of the property or profits as trustee than his co-adventurers are entitled to. The mere fact that he is intrusted with the rights of his co-adventurers imposes upon him the sacred duty of guarding their rights equally with his own, and he is required to account strictly to his co-adventurers, and, if he is recreant to his trust, any rights they may be denied are recoverable."

With these principles to guide us, let us examine the record to see whether the essentials of fraud appear therein. First, as to the representations. Representations which give rise to an action of fraud must, of course, be of matters of fact which exist in the present, and not merely an agreement or promise to do something in. the future, or an expression of opinion or judgment as to something which has happened or is expected to happen. To this there is one exception, that when a promise to perform a future act is made with the present intention on the part of the promisor that he will not perform it, it is such a representation as will give rise to an action of fraud. *Law* v. *Sidney,* 47 Ariz. 1, 53 Pac. (2d) 64. Up to the time that defendant requested plaintiff to join in the organization of the development company, there is no contention that there was any fraud or deceit on his part. The situation at that time was that plaintiff had certain contracts with the land company under which it would have been obliged to pay him either on ·or before the expiration of three years many thou-

sand dollars, in return for which he was obligated to perform certain services which he was, so far as the record shows, ready, able and willing to perform, and at that time the land company had no definite future prospects of being able to recoup these payments by selling the land to other parties. It is the position of plaintiff that defendant then conceived the scheme or plan of organizing the development company for the purpose of transferring the liability of the land company to plaintiff to the development company, and thereafter by manipulating the development company and its operations deprive plaintiff of his property and the fruits of his contracts with the land company. This he could easily do because of the facts that through his ownership of stock he controlled both the development company and its board of directors, and that he was an experienced business man, well versed in the manipulation of corporate affairs, while plaintiff was primarily a farmer, with very little knowledge of how such matters were handled, and with full trust and confidence in his co-adventurer.

The complaint, in setting up the alleged fraudulent representations which induced plaintiff to turn over his assets to the development company, mixes statements of fact, of opinion, and of future action indiscriminately, and in many cases pleads evidence rather than ultimate facts. However, we can gather therefrom that it is alleged that both defendant and Brown stated that the contract which plaintiff had with the land company was of such a nature that it had interfered greatly with sales to prospective purchasers; that due to this fact, defendant intended to stop further development of the project and thus curtail the value of plaintiff's contracts, and that if plaintiff would agree to the organization of the development company and transfer his property to it, defendant would enlarge the scope of its operations in vari-

ous ways, such as giving it control of a large quantity of other land of the company, to such an extent that not only would he be enabled to sell the citrus development, but that large profits would be made by all of the joint adventurers, and that defendant would finance the development company in all its operations to whatever extent was necessary. The statements of defendant in regard to the contract interfering with the sale of the citrus land was false, and he never had any intentions of giving the development company full charge of the other lands of the land company and financing it to the necessary extent or of making any profits for plaintiff, but the whole plan was preconceived for the purpose of depriving plaintiff of his valuable rights under his contracts with the land company. This, if true, in view of the relation of the parties as joint adventurers, we think is sufficient to bring the case within the exception above set forth in regard to promises of future action.

Defendant, of course, denied all of the alleged false representations, and contended all of his actions were in good faith and that the collapse of the development company was due to matters beyond his control.

Plaintiff introduced direct evidence sufficient to justify the jury in believing that the representations were made as alleged in the complaint. It is a familiar rule of law that intentions generally must be established by circumstantial evidence, and we think the entire evidence and the conduct of the parties all the way through was sufficient to justify the jury in believing, as it must have believed, that the whole plan and conduct of the development company was a preconceived scheme on the part of defendant to ease plaintiff out of the picture, and that he never at any time had any intention of living up to his promises to plaintiff. The undisputed fact that at the time the development company was organized plaintiff had con-

tracts which, with his personal and real property, were estimated by all of the parties at the time as being worth $97,000, and that at the end of less than two years he had nothing except $1,500, while the land company which defendant controlled had all of plaintiff's property, was of itself sufficient to raise a reasonable belief in the minds of an impartial jury that there was "something rotten in Denmark." We are of the opinion that the complaint and the evidence taken as a whole justified the jury in finding that the essential elements of fraud existed and that plaintiff was entitled to recover such damages from defendant as he could prove were actually caused by the latter.

Defendant has separated the general allegations of the complaint in regard to fraudulent representation into thirty-four specific ones, and urges most strenuously that there are many of them which even if made would not support a judgment. We think that the complaint should be considered as a whole and that thus considered it presented a picture to the jury which, if true, legally sustained a verdict for plaintiff. Many of the thirty-four specific allegations, it is true, are not of themselves fraudulent representations of a nature which, standing alone, would sustain a verdict, but all of them were admissible in evidence for the purpose of showing that defendant was not in good faith offering a plan which he intended to or believed he could carry to successful fruition, but that he was endeavoring in every possible manner, and by means of every kind of statement of fact or opinion and promise to induce plaintiff to enter into a joint adventure which he had proposed for the purpose of ultimately defrauding the latter. It would, therefore, have been improper for the court to withdraw from the consideration of the jury any of the various misrepresentations, for they were all proper evidence as to one of the ultimate facts; to-wit,

the intention of the defendant when he made his proposal to plaintiff. Defendant asked the court to instruct the jury as to which of the particular thirty-four representations was a fact sufficient to support a judgment and which was not, and that it should entirely disregard those which were not. We think the request of defendant, if it had been carried out by the court, would have tended to mislead and confuse the jury as to the real issues of the case rather than to enlighten it, and it was bad so far as the request to disregard the representation was concerned. The court did give the following instruction:

"The court instructs the jury that in order to constitute actionable fraud, the false representations must be of a matter of fact which exists in the present or has existed in the past and cannot be predicated upon the mere expressions of opinion, or upon representations in regard to matters of estimate or judgment.

"The court instructs the jury that statements or representations as to the future value or profitableness or prospects of a business are mere expressions of opinion and no action can be based thereon.

"The court further instructs the jury that a representation that something will be done in the future or a promise to do something in the future is at most a contract and not a fraudulent representation such as will sustain an action for fraud. To this rule there is an exception, and that is where the promise to perform a future act was made with a present intention on the part of the promisor that he would not perform it, but the burden of showing such present intention on the part of the promisor not to perform his promise, rests upon the plaintiff."

This is a correct exposition of the law, and we think gave the jury the necessary rule to apply to the various allegations of fraudulent conduct.

The next thing which we consider is the measure of damages. The trial court's instructions on this point were:

"Now the plaintiff alleges in this complaint that by reason of this alleged fraud he lost his contract with the Arizona Citrus Land Company, that is the original contract and the supplementary contract which was read to you. He alleges that he lost all of his rights under those contracts. He says that he lost his machinery and equipment, and he alleges that he lost his nursery stock, his trees and his buds, and he says that he has been damaged by reason of the loss thereof in the sum of $60,476.29. So the plaintiff asks judgment in his favor and against the defendants in that sum.

" . . . you must then ascertain from the evidence what, if any, damage he has suffered because of such representations, and in the event you find that the plaintiff is entitled to damages, then I instruct you that you must deduct from said amount the sum of $1,500.00 which the evidence shows was paid to the plaintiff, and in the event the damages which you determine the plaintiff entitled to, if any, does not exceed the sum of $1,500.00 then your verdict should be for the defendants.

"Under the allegations of his complaint the plaintiff claims to have suffered damages by reason of certain contracts described in his complaint, and that his machinery and equipment, certain nursery stock, trees and buds, and it is incumbent upon him to prove the loss by a preponderance of the evidence, as I have instructed you, and in fixing the damages that might result, if you find that the plaintiff is entitled to damages, these are the only things that you can take into consideration in determining the amount, if any, of the plaintiff's loss.

"If after a careful consideration of all the evidence in this case you find that the defendants did make the representations alleged to have been made in the complaint on file herein, then you should proceed to ascertain plaintiff's loss resulting to said plaintiff by virtue of such misrepresentations.

"In this regard, gentlemen, you may consider the value of the contracts which the plaintiff had with the Arizona Citrus Land Company, and you are instructed, as a matter of law, that on the 7th day of April, 1933, the Arizona Citrus Land Company did agree with the plaintiff herein to contract with the plaintiff under

the terms of the nurseryman's agreement for 200 acres of citrus land, extending the time of the payment therefor, for three years unless such lands were sold, but there is no evidence in this case of a sale.

" . . .

"I further instruct you, gentlemen, that if you find for the plaintiff, you cannot allow anything on account of profits that the plaintiff hoped to derive from future operations; that the earning of such profits is too uncertain and speculative to form the basis for any measure of damages.

" . . .

" . . . and it is also your duty to insert in the blank line left for that purpose the amount that you find that the plaintiff is entitled to recover. However, in no event can that amount exceed the amount sued for by the plaintiff, which is $60,476.29."

This is all that could by any means be considered as giving the jury a basis upon which to estimate the damages. Does it correctly state the law, or was it misleading as to the true measure of damages? The gist of the instructions, so far as they can be said to give a guide to the jury, is that the measure of damages is based upon the value of the property which the plaintiff gave in exchange for the stock in the development company. This is not true. He knew that when he made the exchange that he was to get this stock for the property. The damage to him, if any, was through the false representations which affected the value, not of his property, but of the stock for which he traded it. Had the action been for a rescission and return of plaintiff's property, the situation would have been different.

We think that in Arizona in a case like the one at bar the case of *Curry* v. *Windsor*, 22 Ariz. 108, 194 Pac. 958, 959, states the correct rule of measure of damages. Windsor had conveyed to Curry certain property in exchange for an undivided one-third interest in certain lots, and the court said:

"  . . . The only reasonable construction we are able to place upon the pleadings is that the cross-complaint constitutes an action on the case for deceit. If we are correct in this conclusion, then the true rule of damages in case of a verdict for Windsor is the *difference between the actual value of the lots he received and their value if the alleged fact regarding them had been true.* Curry is to make good his representations of fact as though he had given a warranty to that effect. This rule makes recovery exactly commensurate with the injury. . . . " (Italics ours.)

In the present case plaintiff conveyed to the development company, at the instance of and on the false representations of defendant, certain property, receiving in exchange therefor 23 per cent. of the stock of the development company. Defendant represented certain facts and made certain promises in regard to the company which he did not intend to carry out. The measure of damages, therefore, is the difference between the value of the stock given plaintiff under the circumstances as they actually did exist, considering the manner in which defendant handled the affairs of the company, and what would have been the value of the stock if defendant had carried out his promises in regard to the company and had managed it with perfect good faith towards the interest of plaintiff.

There are a number of other assignments of error covering various points such as the statute of limitation, the form of verdict submitted, *et cetera,* which we have not discussed, although we have carefully considered them, for the reason that we think the action of the court thereon does not constitute reversible error.

██ We have held that when the jury is given an erroneous test of the measure of damages by the instructions of the court, but there is no other reversible error in the record, the case may be reversed on that issue alone. *Atchison, T. & S. F. Railway Co.* v.

*Gutierrez,* 30 Ariz. 491, 249 Pac. 66, 67. The present case took eighteen days to try. The reporter's transcript covers 1430 pages and the abstract of record 610 pages. In view of the fact that the only reversible error committed by the court was erroneous instructions on the proper measure of damages, we think it would be both unnecessary and unfair to order a retrial of all the issues in the case. We have, therefore, concluded to reverse it on the amount of damages alone, and remand it for a new trial on that issue only. In determining the amount of damages at the new trial, it should, of course, be remembered that defendant cannot be held responsible for depreciation in the value of the stock of the development company caused by the general depressed condition of the country, nor the inability to find purchasers for the citrus land, nor for speculative future profits or expressions of opinion as to such profits. He is liable only for such damages as reasonably resulted to the value of the stock from his failure to carry out his promises and from any deliberate or intentional misconduct in the affairs of the corporation for the purpose of depreciating plaintiff's investment and wrecking it.

The judgment of the lower court is reversed and remanded with instructions to grant a new trial upon the issue of damages alone, under the principles laid down in this opinion.

ROSS, C. J., and McALISTER, J., concur.