492 P.2d 735

HUNTER CONTRACTING CO., an Arizona corporation, Armando Taddei and Marian H. Taddei, husband and wife, Appellants,

v.

SANNER CONTRACTING COMPANY, an Arizona corporation, Appellee.

No. I CA–CIV 1530.

Court of Appeals of Arizona, Division 1, Department B.

Jan. 10, 1972.

Rehearing Denied Feb. 7, 1972.

Review Denied March 14, 1972.

Burch, Cracchiolo, Levie, Guyer & Weyl by Daniel Cracchiolo, Phoenix, for appellants.

Evans & Kunz, Ltd. by James A. Simmons and Donald R. Kunz, Phoenix, for appellee.

JACOBSON, Judge.

In this appeal, the Court is requested to review an action for breach of contract caused by fraudulent misrepresentation.

The plaintiff-appellee, Sanner Construction Company (Sanner) brought an action against defendant-appellant, Hunter Construction Company (Hunter) for breach of contract and subsequent damages resulting from a fraudulent misrepresentation. The case was submitted to a jury on the theory of fraud. The jury returned a verdict in favor of Sanner in the sum of $178,597.39 as compensatory damages and One Dollar as punitive damages. Hunter has appealed from this judgment.

Hunter, a general contractor, was awarded a contract in November, 1966, by the United States Bureau of Public Roads to build a forest highway in the vicinity of Clint Wells, Arizona. In connection with this project, the Bureau of Public Roads had designated a particular gravel pit which was to be used in obtaining the sub-base material utilized on the road bed. Having found a more convenient gravel pit, Hunter submitted a request to the bureau to approve the new gravel pit location. This request was accompanied by various tests of the new pit, performed by Northern Arizona Testing Laboratory. The tests, which were comprised of core samples, were taken from the bureau pit and the new proposed site, the Last Chance Mine. In all, eleven tests were conducted, locations of each test appearing on each of the test reports. In February, 1967, the bureau authorized the change of location from its designated site to the Last Chance Mine location. A distance of approximately three miles separated the two sites. The Last Chance Mine pit was located on land belonging to the Page Land and Cattle Company, from whom Hunter had originally obtained permission to take gravel. After the bureau had approved Hunter's requested change of pit location, the cattle

company revoked its former permission. This left Hunter with a smaller area from which to extract the needed gravel.

Hunter had initially employed a subcontractor, Dale Sisson, to produce the gravel necessary for the highway project. Mr. Sisson began working the new smaller pit location, but apparently ran out of material there so he moved his operation to a new location approximately a quarter of a mile away. This third location, which was later known as the Sanner Pit, was not part of the area which had been previously tested. For a number of reasons, Sisson's performance of the subcontract was unsatisfactory and he was discharged.

The president of Hunter, Armando Taddei, contacted Sanner in June, 1967, to determine if Sanner would be interested in the crushing job previously performed by Sisson. The president of Sanner, Bailey Sanner, indicated his interest in the project but indicated he wished to inspect the pit site. Shortly thereafter, Taddei, Sanner and Sanner's crushing foreman drove to the crushing site in Taddei's automobile. During the trip Sanner asked Taddei if he had any tests of the pit location, whereupon Taddei handed Sanner the tests which had been procured for the pit change. Sanner and his foreman briefly examined the reports and then returned the same to Taddei. Upon arriving at their destination, Taddei showed Sanner the last area where Sisson had been working. The pit had been staked out, cleared off (scalped) and partially worked. Sanner and his foreman both testified that Taddei said, "here are the core samples, here is the pit, how much are you going to charge me?" The core tests were handed to Sanner who then toured the area conferring with his foreman for about fifteen to twenty minutes. After looking at the tests, visually inspecting the staked óut pit, and picking up and feeling the soil, Sanner quoted a bid which Hunter accepted. The core tests were then given to Sanner's foreman who was to use them in setting up his screening operation. Subsequently, the parties signed a formal contract which gave Sanner 45 days to complete the job.

In the early part of July, 1967, Sanner began his crushing operation, but during the summer months found it exceedingly difficult to produce the necessary material because of heavy rainfall. After the rainy season ceased in September, Sanner was unable to increase its production because it encountered hard rock material. Since the material Sanner was attempting to extract did not match the core tests, Sanner contacted Northern Arizona Testing Laboratories, which had conducted the core tests shown to Sanner, to perform an examination of the pit. On September 20, 1970, a representative of Northern Arizona Testing Laboratories examined the material and in substance subsequently testified that the site was not suitable for the material known to be needed for the project. He further testified that the core tests made by his company were not performed at the Sanner pit.

When it realized that the job was going to be more difficult to perform, Sanner rented larger equipment and added more men; this additional effort enabled it to complete the contract by mid-December, 1967. The total amount payable to Sanner under the initial contract was $102,701.19, which included a profit of approximately $16,482.00. It was necessary for Sanner to expend approximately $162,000.00 in order to complete the project. Sanner claimed damages in the sum of $178,597.39, representing the cost of completion, together with his anticipated profits.

■ Hunter's initial contention on appeal is that Sanner was not a duly licensed contractor and hence it was barred from maintaining this action by reason of A.R.S. § 32–1153. This defense was originally presented to the trial court by way of a post trial motion on July 2, 1970.

A.R.S. § 32–1153 prohibits a contractor from maintaining any action for collection of compensation for the performance of any act for which a contractor's license is required without first alleging and proving

that he was a duly licensed contractor at the time the contract was entered into and at the time when the claim arose.

Insofar as this defense is concerned, the facts adduced at a hearing before the Registrar of Contractors held on June 24, 1970, showed that Sanner had held a Class A license from the Registrar of Contractors since 1962. The test for the license was initially taken by Adrian Ashley, Sanner's stepfather. Each time the license was renewed, Ashley signed as the responsible managing employee, but he had not been on the company payroll as an employee since 1962.[1]

Appellant argues that since Mr. Ashley was not an employee of Sanner when he made such representation, a fraud has been perpetrated upon the Registrar of Contractors under Rule 26 of the Registrar of Contractors which provides:

"[That] the responsible managing employee . . . shall be a regular and bona fide employee whose principal employment is with the employer for whom he has qualified and must have active and direct supervision and control of all operations . . . .."

Furthermore, appellant contends that the trial court could properly determine the validity of Sanner's license prior to any action by the Registrar of Contractors under A.R.S. § 32–1159, subsec. E which states:

"The suspension or cancellation of a license as provided in this chapter may also be embraced in any action otherwise proper in any court involving the licensee's performance of his local obligation as a contractor."

We cannot agree with appellant's argument that Sanner lacked standing to maintain this action. The statutes dealing with revocation or suspension of a contractor's license (A.R.S. § 32–1154 to 1160) set out a specific procedure by which a contractor's license may be suspended or revoked. Such action may only be taken by the Registrar of Contractors on his own motion or when activated by the filing of a verified complaint. Moreover, the mere commission of a prohibited act is insufficient in and of itself to invalidate the license. Rather, the Registrar of Contractors must initiate the formal procedure for revocation or suspension and notice of the hearing and an opportunity to defend must be given. Rosen v. Hadden Const. Co., 81 Ariz. 194, 303 P.2d 267 (1956). Therefore, appellant's theory that Sanner was guilty of fraud as a result of which his license was automatically revoked is not well founded.

■ Nor, in our opinion, can a determination by the Superior Court be substituted initially for a determination by the Registrar of Contractors under Section E of A.R.S. § 32–1159. Such a reading of Section E is totally inconsistent with our well established concepts of exhaustion of administrative remedies. Campbell v. Chatwin, 102 Ariz. 251, 428 P.2d 108 (1967). Administrative agencies exist to make such determinations in their specialized field as the legislature has deemed proper. For this court, or any other court, to make a determination that a contractor's license should be revoked, without a prior administrative determination, is simply to ignore the regulatory functions of administrative agencies as authorized by statute. Campbell v. Chatwin, *supra*.

Subsection E must be read in connection with the preceding sections of A.R.S. § 32–1159. Sections A, B, C and D of this statute deal with the appellate procedure available to one aggrieved by a decision of the Registrar of Contractors. Section E must have been intended to apply in those situations where the Registrar has suspend-

---

1. At the June 24, 1970, hearing the Registrar of Contractors found that Sanner had violated § 6 of A.R.S. § 32–1154 (Misrepresentation of Material Fact by the Applicant); for Adrian Ashley was the qualifying agent for another company. Due to unusual circumstances, not relevant to this appeal, the Registrar only suspended Sanner's license for 60 days; the suspension was to apply prospectively to bidding and execution of new jobs.

ed or cancelled a contractor's license, after which the appeal of such decision may be embraced in an already pending court action which involves the licensee's performance of his duties as a contractor. In our opinion, this subsection allows the action taken by the Registrar to be reviewed without the necessity of a separate proceeding, but as joined in an action in which the contractor's license is in question. While Section E may be read to cover situations not envisioned by this court, it is clear to us that subsection E does not give a superior court the initial power to revoke the contractor's license without a prior administrative determination on the merits.

This then brings us to the merits of this action. It is a well established principle in this state that in order to sustain an action in fraud, the so-called nine elements of fraud must be shown. Waddell v. White, 56 Ariz. 420, 108 P.2d 565 (1940); McElwain v. Schuckert's Furniture, 13 Ariz.App. 468, 477 P.2d 754 (1970).

Hunter first questions whether the elements of a representation and its falsity have been shown. This attack is in essence a question of the sufficiency of the evidence as to these elements. In reviewing the evidence we note that Bailey Sanner testified that Taddei said: "Here are the core samples, here is the pit. How much are you going to charge me?" From this statement alone sufficient evidence existed from which a jury could reasonably conclude that there was a representation that the core tests were taken from the pit shown to Sanner, when in fact the representation was false. Upon reading the transcript, it is apparent that the facts in this case were vigorously disputed and that the record is replete with conflicting testimony. An appellate court will not disturb the findings of the jury when there is evidence which would reasonably support the judgment. Grant v. White, 103 Ariz. 257, 439 P.2d 828 (1968).

Appellant next contends that Sanner had no right to rely on the core test because these tests were not a representation of fact, but merely an opinion. Therefore, the argument continues, Sanner's reliance as a matter of law was not justified. In support of the above proposition, Hunter relies on a quotation taken from 37 Am.Jur.2d § 86 (1968) on fraud, as it relates to soil conditions:

> "But in the absence of anything further by way of deception, boring sheets themselves . . . if they present only the findings at the points of the borings, are not representations that the sub-surface conditions in general are those so found."

As indicated by this rule, core tests may not be relied upon, "in the absence of anything further by way of deception." Here, the jury could have found something "further by way of deception." Taddei handed to Sanner the core tests which were taken from an area altogether different from the area shown and indicated that they were taken from the pit under discussion. Thus, the jury could find that the tests were accompanied by "further deception". Under the circumstances in this case, the right to rely was a proper question for the jury.

Hunter's next allegation of error is based upon the rule to be applied where a waiver of breach of contract has occurred and the duty of the non-defaulting party to mitigate damages arises. This rule provides that once a material breach in a partially-performed construction contract has occurred, the non-defaulting party must elect to either rescind, waive the breach and continue performance, or terminate the contract and sue for damages; and if the innocent party elects to continue performance he thereby waives the breach and he may not recover damages therefor. Weatherford v. Adams, 31 Ariz. 187, 251 P. 453 (1926). This court is precluded from giving its opinion as to the applicability of this rule as applied in this case because appellant has not raised this legal theory during the trial. Milam v. Milam, 101 Ariz. 323, 419 P.2d 502 (1966). As

stated in Payne v. Payne, 12 Ariz.App. 434, 471 P.2d 319 (1970):

" . . . a party must timely present his legal theories to the trial court so as to give the trial court an opportunity to rule properly."

The trial court gave, without objection, the following instructions:

"I instruct you that when a party has been induced to enter into a contract by the means of false and fraudulent representations, he is entitled upon the discovery of the fraud to continue to perform the contract and sue for damages resulting therefrom."

This instruction is diametrically opposed to Hunter's contention on appeal as to the applicable rule of law as to damages and yet no objection was made thereto.

■ Hunter contends it reserved the right to question the measure of damages by requesting and the court giving the following instruction:

"If you find . . . that any portion of the damages suffered by Sanner Contracting Co. were a result of its own neglect, failure to act when it had a duty to do so, or its actions under the circumstances which you believe to be unreasonable, you may reduce the amount of such damages by a sum which you find to be equal to those caused by such acts of plaintiff."

The giving of this instruction does not cure the failure to request an instruction which would set forth Hunter's theory that once a breach of the contract became known, the innocent party could not continue the contract without waiving that breach. This instruction does not deal with waiver of a breach, but with the right of plaintiff to collect damages caused by his own fault. It was incumbent upon Hunter to specify with clarity the specific legal theory he intended to rely upon to the

trial court. Payne v. Payne, *supra*.[2] This it failed to do.

■ Finally, Hunter urges that the failure to object to the instructions detailing Sanner's theory of damages should not be fatal because the error contained therein is of such magnitude that it constitutes fundamental error, and as such this court has the discretionary power to review the error and grant a new trial. The cases cited by appellant for this proposition all deal with purported constitutional rights, including cases on incorrect statements of the law of contributory negligence. Michie v. Calhoun Bros. Livestock Transportation Co., 85 Ariz. 270, 336 P.2d 370 (1959); Kelch v. Courson, 103 Ariz. 576, 447 P.2d 550 (1968). Suffice it to say that we find no fundamental error rising to the status of a constitutional guarantee in this case and decline to review this issue without a prior presentation to the trial court.

■ Hunter further alleges error in the admission of exhibit 58, which sets forth the total cost to Sanner of completing the contract, on the grounds it was speculative. Counsel on both sides devoted considerable time in eliciting testimony on the accuracy of this exhibit. At best, a conflict in the evidence resulted and the resolution thereof was for the trier of fact. Yahnke v. State Farm Fire & Cas. Co., 4 Ariz.App. 287, 419 P.2d 548 (1966).

■ Appellant's final contention deals with the alleged error in allowing the question of punitive damages to go to the jury. It is the general rule that merely because the action sounds in fraud, a recovery of punitive damages will not necessarily be allowed. Jenkins v. Skelton, 21 Ariz. 663, 192 P. 249 (1920). However, punitive damages are allowable where the fraud is gross, or where extraordinary facts are present, indicating malice and ill will, as for example, where it appears that the

2. A close examination of the record reveals an absence of any theory advanced by appellant that plaintiff waived the breach and is thus not entitled to damages after discovery of the alleged fraud.

**246**

wrongdoer acted with a deliberate intent to injure the victim. *See,* 37 C.J.S. Fraud § 144 (1944). The Arizona Supreme Court has held that there must be some added element in addition to the tortious conduct which caused the injury before punitive damages can be awarded in an action for fraud. Lufty v. R. D. Roper & Sons Motor Co., 57 Ariz. 495, 115 P.2d 161 (1941). In *Lufty,* the court stated: (citing 24 Am. Jur. 51 § 222)

> "The general rule is that 'the allowance of exemplary or punitive damages is based on aggravated, wanton, reckless, or malicious intentional wrongdoing.' "

Just a simple showing of actionable fraud, without the presence of one of the aforementioned elements is not sufficient to submit to the jury the issue of punitive damages. In the case at bar, there is no evidence of any intentional and willful desire to injure the appellee nor any aggravated conduct which accompanied his fraudulent acts. The facts in this case support simple fraud only; they do not support an inference of the additional elements required for punitive damages.

We therefore hold that the trial court erred in allowing the issue of punitive damage to go to the jury and the judgment of the trial court should be so modified.

We further admonish counsel that the issue of punitive damages should not be interjected into a lawsuit for the sole purpose of allowing evidence of the net worth of the defendant to be placed before the jury. We hold, however, that in this case, such evidence being placed before the jury resulted in harmless error, as there existed sufficient other evidence in this contract action to justify the jury's verdict.

For the foregoing reasons, the judgment of the trial court is modified by striking the recovery for punitive damages; and, as so modified, the judgment is affirmed.

EUBANK, Acting P. J., and STEVENS, J., Department A, concur.