31072. INDEPENDENT BANKERS ASSOCIATION
OF GEORGIA, INC. v. DUNN et al.
31073. CITIZENS & SOUTHERN NATIONAL BANK
et al. v. INDEPENDENT BANKERS ASSOCIATION.

UNDERCOFLER, Presiding Justice.

This appeal is from the refusal of the trial court to hold the Commissioner of Banking and Finance of the State of Georgia in contempt for failure to comply with a mandamus absolute. It had ordered him to take appropriate action to require the Citizens & Southern National Bank, the Citizens & Southern Holding Company, and the ten associate correspondent banks to comply with the Georgia banking laws relating to bank holding companies. The Independent Bankers Association of Georgia filed a petition for contempt against the commissioner alleging that he had failed to take such action. The trial court found, among other things, that the commissioner ". . . has endeavored in good faith to comply with this court's order. . ." The petition for contempt was denied.

This is the third appearance of this case. In *Independent Bankers Assn. of Ga. v. Dunn,* 230 Ga. 345 (197 SE2d 129) (1973) it was held that the Citizens & Southern National Bank and the Citizens & Southern Holding Company were in violation of the Georgia banking law relating to holding companies and that the trial court should issue a mandamus ordering the Georgia Commissioner of Banking and Finance to compel compliance. Thereafter the trial court issued a mandamus absolute directing the commissioner to take specified action. In *Citizens & Southern Nat. Bank v. Independent Bankers Assn. of Ga.,* 231 Ga. 421 (202 SE2d 78) (1973) it was held that the mandamus absolute should not have given specific directions as to how the commissioner should compel compliance with the banking laws. Accordingly the trial court issued the mandamus absolute directing the commissioner ". . . to take appropriate action against [the defendants] . . . to require said banks and holding company to comply with and obey the applicable provisions of the banking laws of the State of Georgia relating to bank holding companies in accordance with

the decision of the Supreme Court of Georgia. . ." In compliance with the mandamus absolute the commissioner issued an order containing nine separate provisions, a schedule of completion dates, and reversing the right to amend the order and make examinations to insure compliance with the order. The Independent Bankers Association claims the commissioner's order, ". . . was totally abortive to compel compliance with the decisions of this court." *Held:*

The record of the hearing on the contempt citation is voluminous. In our opinion it would overburden this opinion to set out the evidence of the respective parties as to the commissioner's compliance or noncompliance with the mandamus absolute. We think it is sufficient to state that the record has been reviewed and we have concluded that any failure of the commissioner to comply with the mandamus absolute was not wilful and the trial court did not abuse his discretion in refusing to hold him in contempt. *Bankers Life & Cas. Co. v. Cravey,* 209 Ga. 274 (71 SE2d 659) (1952); *Bd. of Ed. of Loganville v. City of Loganville,* 166 Ga. 640 (144 SE 25) (1928).

*Judgment affirmed; cross appeal dismissed. Undercofler, P. J., Hall and Hill, JJ., and Judge Lamar Knight, Judge George L. Jackson and Judge Frank S. Cheatham, Jr., concur. Jordan, J., dissents. Nichols, C. J., Gunter and Ingram, JJ., disqualified.*

ARGUED MARCH 10, 1976 — DECIDED JUNE 22, 1976 — REHEARING DENIED JULY 14, 1976, IN CASE NO. 31072.

*Martin, Snow, Grant & Napier, Cubbedge Snow, Charles M. Stapleton, Timothy J. Sweeney, Assistant Attorney General,* for Independent Bankers Association of Georgia, Inc. et al.

*Alston, Miller & Gains, Daniel B. Hodgson, Ben F. Johnson, III, Timothy J. Sweeney, Assistant Attorney General,* for Dunn et al.

*Alston, Miller & Gaines, Daniel B. Hodgson, Ben F. Johnson, III, Charles Gordon Brown,* for C. & S. National Bank et al.

JORDAN, Justice, dissenting.

In order to place this application for contempt in the proper prospective, a brief history of this litigation is in order.

Though the Commissioner of Banking & Finance of the State of Georgia is authorized on his own motion to enforce the provisions of the banking laws of this state by injunction or otherwise, the appellant was forced in 1972 to bring a mandamus petition against the commissioner requiring him to enforce the banking laws of this state as related to the activities of the Citizens & Southern National Bank. The merits of this case reached this court by oral argument on December 12, 1972, and an opinion issued on March 5, 1973.

We made two things clear in our opinion in *Independent Bankers Assn. v. Dunn,* 230 Ga. 345 (197 SE2d 129) (1973). First, that the stockholders in the C. & S. National Bank who owned stock in the "five per cent" banks were "persons who otherwise own" the Citizens & Southern Holding Company; that their stock was therefore attributed to the holding company, thereby making the holding company in violation of the Georgia banking laws. Code § 13-207. Secondly, we held that through this arrangement the C. & S. National Bank and the C. & S. Holding Company were indirectly controlling more than five per cent of the stock of the ten named banks; and that this finding of illegal control of these banks was demanded by the evidence.

Clearly two things had to be done to eliminate this violation by the bank and the holding company — divestiture of stock and elimination of control, directly or indirectly.

Pursuant to this opinion of the Supreme Court the trial court entered its mandamus absolute to the commissioner. The mandate was there. The commissioner's duty was clear. Even a casual perusal of the record before us in this case demonstrates that after more than three years from the date of our opinion there has been little, if any, compliance with the mandate of the court. There can be little doubt that though there has been a somewhat spurious divestiture of the stock by the holding company, the control of these banks is as firm and

complete as it ever was or ever has been. That this condition still exists lies squarely at the feet of Commissioner Dunn.

Back to the history of the litigation. Some five months after the issuance of the mandamus absolute, the commissioner got around to issuing an order purporting to require the C. & S. National Bank and the holding company to comply with the decision of this court and the mandate of the trial court. To demonstrate the ineffectiveness of this order the appellant introduced into evidence in this record a memorandum written to the associate banks by Richard L. Kattel, President of the Citizens & Southern National Bank, immediately after Commissioner Dunn's order had been issued. This memorandum pointed out that the commissioner's order "doesn't keep us from working closely with these correspondent associates in handling all the normal banking business we have customarily handled." The memorandum went on to say "Also, the ruling does not say that personnel policies or overall benefits packaged for the staff of these banks must change one bit. And, finally it doesn't say that these banks must change their way of doing business. In other words, . . . we are going to continue to bring the C & S style of banking to the communities these banks serve." Apparently, as far as the C. & S. National Bank is concerned, it was to be business as usual at the same old stand.

In another portion of the commissioner's lengthy and ambiguous order, the C. & S. Holding Company was required to divest itself of the stock it owned in the ten five per cent banks no later than November 1, 1974. The holding company apparently treated this requirement in a contemptuous manner for just prior to the deadline date it sold its stock in the five per cent banks to the Citizens & Southern Profit Sharing Trust and the Citizens & Southern Pension Trust. The commissioner did not question this sham sale, but responding to an inquiry by a member of the General Assembly, the Attorney General of Georgia issued an unofficial opinion that such a sale was not in compliance with the decision of the Supreme Court. The Attorney General stated, "I have concluded that the divestiture route chosen by the Bank and

Holding Company does not deprive the bank of the indirect control of the five per cent banks. The Bank continues to control by an 'obscure, circuitous method' that which it is prohibited from controlling directly." The commissioner then ordered the sale rescinded. No further action was taken until two days before the final deadline for compliance when the holding company caused said stock to be transferred to "an escrow agent." This action was approved by the commissioner, though it was by no means a divestiture of the stock and control thereof as contemplated by the opinion of this court in 1973. Instead of being a sale and divestiture as contemplated by the opinion of this court, this escrow agreement appears merely to be a deposit of stock with an agent. The escrow agreement provides that the parties shall set the compensation for the agent and that the C. & S. Holding Company will not only receive the proceeds from the sale of the stock but the dividends paid in the interim by the banks. Despite clauses in the agreement purporting to give control of the stock to the agent, title to the stock still remains in C. & S. hands. Despite clauses as to the irrevocability of the escrow agreement there is some question of law as to whether or not such an agreement could be revoked at will by the owners of the stock.

As evidence of continuing control and supervision, the record shows that after the deadline of compliance had passed top officers of the C. & S. National Bank visited one of the five per cent banks and presented it with a trophy for being the outstanding correspondent associate bank for the year 1974. One paragraph of the commissioner's order required C. & S. officers and directors to resign as directors of the five per cent banks. The evidence showed that while the resignations were submitted several such officers later attended board meetings of the associate banks as "guests." As to this practice Commissioner Dunn stated "I saw no reason to tell anyone that a man can't go to a board— if a bank invites someone to attend their board meetings for consultation and advice they have that right." Much additional evidence in the record points to control, directly and indirectly, over the five per cent banks.

I think it is relevant and pertinent to this

investigation that the Commissioner of Banking & Finance admitted that two days before the first deadline for divestiture by the holding company of its stock in the five percent banks that he executed a partnership promissory renewal note to the C. & S. Mortgage Company, a holding company subsidiary, in the principal amount of $391,915.80. He further stated that his outstanding indebtedness to the C. & S. National Bank and its affiliates, either through personal or corporate loans, was "more than three million dollars." This evidence relates directly to the good faith effort of the commissioner to carry out the mandate of the court.

In my opinion, the evidence in this record demands a finding that there has been no bona fide divestiture of stock nor the elimination of control over the associate banks, directly or indirectly, as contemplated by the opinion of this court in 1973. Therefore, the trial court erred in failing to hold the commissioner in contempt or to order him to purge himself of the contempt.

I respectfully dissent.