No. 82-428

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

JOAN A. DEIST,

Plaintiff and Respondent,

-vs-

PAUL D. WACHHOLZ, JOHN R. DITTMAN,
VAN KIRKE NELSON, and CONRAD NATIONAL
BANK,

Defendants and Appellants.

---

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Garlington, Lohn & Robinson; Gary L. Graham
argued and Sherman V. Lohn argued, Missoula,
Montana
Murphy, Robinson, Heckathorn & Phillips,
Kalispell, Montana
Murray, Kaufman, Vidal & Gordon, Kalispell,
Montana

For Respondent:

Sharon Morrison argued, Helena, Montana
William Rossbach, Missoula, Montana

---

Submitted: November 17, 1983

Decided: February 22, 1984

Filed: FEB 22 1984

*Ethel M. Harrison*

Clerk

Honorable Henry Loble, District Judge, delivered the Opinion of the Court.

Defendants Wachholz, Dittman, and Nelson appeal from the judgment of the District Court of the Eleventh Judicial District, Flathead County. Defendant Conrad National Bank was not affected by the judgment and therefore is not a party to this appeal. For the reasons stated below, we affirm the District Court judgment in part, reverse in part, and remand for further proceedings to be conducted in accordance with this opinion.

Joan Deist and her husband, Russell, owned a ranch west of Kalispell, Montana. During the course of operation, Russell incurred a large debt on the ranch, represented by a Farmers' Home Administration mortgage and a demand note with the Conrad National Bank of Kalispell. By the late 1970's, the ranch had become an unprofitable enterprise. Russell died in May of 1978, leaving Joan with a debt of approximately $200,000.

Officers of the Conrad National Bank informed Joan that something had to be done about the debt. Joan had been a ranch wife for much of her life, and although she had been appointed to fill her late husband's seat on the Flathead County Commission, and had been elected to the position in her own right in 1980, she had little, if any, experience in real estate matters. Eugene Gillette, president of the bank and a family friend, advised Joan that she had three options: continue to operate the ranch, subdivide it, or sell. Gillette recommended a complete liquidation of her interest in the property, recognizing that the ranch was not

turning a profit in its current condition, and that Joan would not pursue subdivision.

Paul Wachholz was vice-president for marketing at the Bank. According to his testimony at trial, his chief responsibility consisted of matching people with business opportunities, although he did counsel bank customers from time to time. Wachholz had toured the Deist ranch with other bank officials after Russell's death when they were in the process of deciding how to help Joan deal with the outstanding debt. Joan asked him to help her find a buyer, and he agreed to do so. There is nothing in the record to suggest that he was authorized to negotiate a sale on Joan's behalf, or that he acted in an advisory capacity similar to the role played by Eugene Gillette. Apparently, any offers to buy made their way to Joan through Roy Deming, an agricultural loan officer with the Conrad National Bank. Deming then passed on any information about prospective buyers to Joan.

That the Deist ranch was for sale was obviously common knowledge in the Kalispell community, as Joan was approached by prospective buyers or individuals who knew about prospective buyers. One of the former was Dr. Loren Vranish, a local physician and acquaintance of Joan Deist. Joan was willing to negotiate with Vranish, and her attorney, James Murphy of Kalispell, assisted her in drawing up acceptable terms. Vranish made an offer to purchase the real property for $500,000 with a $50,000 down payment and monthly payments of approximately $3800 reflecting an interest rate of nine-and-one-half percent (9-1/2%). Vranish also wanted deed releases included in the contract,

to allow sale of 80 acre parcels after 1985. Although Joan was hoping that an agreement could be reached, the negotiations eventually fell through. Vranish was having trouble raising sufficient money to make the purchase. He sought a loan from the Conrad National Bank, but was turned down. Vranish's testimony, however, revealed that his deal with Joan collapsed over the proposed deed release provisions. Joan was unwilling to sell without assurances that the land would be preserved for agricultural use. Vranish testified that he intended to ranch the land for as long as it proved economically feasible to do so, but wanted the deed release option available. This compromise was unacceptable to Joan.

In the meantime, however, another offer became available. Wachholz referred a local forestry consultant and real estate investor, John Dittman, to Joan's attention. Dittman was willing to purchase the ranch, and had already submitted an offer to Roy Deming in late September of 1978, about the time the Vranish deal was floundering. Wachholz and Gillette represented Dittman to be a reputable buyer, and Joan testified that Wachholz told her that entering into an agreement with Dittman would be a "good deal." After the Vranish deal fell through, negotiations between Murphy, Joan's attorney, and Dittman proceeded.

There is some dispute about the extent of Joan's knowledge as to what took place during these negotiations. Joan usually was not present when Murphy and Dittman discussed contract terms. Eventually, on January 2, 1979, Joan signed a contract for deed with Dittman, who purchased as a trustee. There were no other signatories to the

contract, and there was nothing in the contract, except the designation of Dittman as trustee, to indicate whether other buyers were involved in the purchase. The agreement called for a sales price of $532,400 for the land and outbuildings with $74,200 downpayment and the balance to be paid over fifteen years at eight percent (8%) interest. Interestingly, the agreement provided for deed releases beginning in 1980. Joan also sold the farm machinery for $25,800.

The immediate dispute began the same day the contract was signed. While dining with her daughter and son-in-law, Joan learned from them that Wachholz and a local physician, Van Kirke Nelson, were partners in the Dittman purchase. The three had entered into a partnership agreement covering the ownership and management of the ranch a few days before the contract was signed. Furthermore, testimony at trial revealed that Dittman and Wachholz were partners in other local real estate transactions. Joan was apparently upset about this revelation and, in particular, Nelson's involvement, although she testified at trial that, some time prior to completion of her negotiations with Dittman, Wachholz had told her that he might join in the Dittman purchase. She insisted, however, that Wachholz never told her that he had finally decided to join Dittman.

In the weeks following the signing of the contract, Wachholz, Dittman and Nelson had the land platted into twenty and forty acre parcels, in expectation that proposed changes in state law might affect future subdivision of the property. They sold the ranch machinery and equipment, and eventually sold the Deist family home located on the ranch,

-5-

in addition to twenty acres for $115,000 on a contract providing nine-and-one-half percent (9-1/2%) interest. In the interim, Joan sought advice as to any legal recourse she might have against Wachholz, Dittman and Nelson. In December, 1979, Joan formally requested rescission of the contract, but her request was refused. In September of 1980, the partners sold another twenty acres for $56,000 on a contract for nine-and-one-half percent (9-1/2%) interest.

A complaint was filed in January, 1980, seeking rescission of the contract as against Wachholz, Dittman and Nelson, and, in the alternative, damages from the transaction as against the Conrad National Bank. The theory behind the initial complaint involved an alleged breach of fiduciary duty by Wachholz or the Bank to Joan. An amended complaint filed in May of 1981 clearly set forth allegations of constructive fraud and undue influence on the part of Wachholz, and sought rescission against the three partners or, in the alternative, damages against the Bank.

After extensive discovery, the case came to trial in April, 1982. Following trial and further briefing, the court rendered judgment against Wachholz, Dittman and Nelson. The Court concluded that Wachholz owed Joan a fiduciary duty both in his capacity as an officer of the Bank, which the court found was in a fiduciary relationship with Joan, and because Wachholz and the Bank were her agents in the sale of the ranch. Wachholz was found liable for constructive fraud and undue influence in his dealings with Joan, and the contract was ordered rescinded as to all parties. Joan was ordered to tender payment of monies received under the contract together with ten percent (10%)

interest, and defendants were ordered to pay Joan rental payments for the time the ranch was in their possession, and also the monies due them under land sales made after the contract was signed. An amended judgment was entered specifying the sums due all of the parties. The Bank was not adjudged liable to Joan in any way. Wachholz, Dittman and Nelson filed a notice of appeal.

Appellants present four issues for review:

(1) Whether the trial court erred in finding that a fiduciary relationship existed on the part of Wachholz with respect to dealings with Joan?

(2) Whether the trial court erred in finding constructive fraud and undue influence respecting the real estate transaction between Joan and the appellants?

(3) Whether rescission was a proper remedy?

(4) Whether the trial court erred in its determination of amounts due Joan under the judgment?

THE EXISTENCE OF A FIDUCIARY DUTY

Appellants correctly note that a finding of a fiduciary duty is essential to subsequent findings of constructive fraud and undue influence. In the absence of such a duty, Joan's grounds for rescission are shaky at best.

The claim of a fiduciary duty on the part of Wachholz is based on three alleged relationships: (1) that the Bank was Joan's agent for the sale of the ranch, and that the fiduciary duty arising from the agency relationship flowed to all the Bank's officers, including Wachholz; (2) that Wachholz was Joan's personal agent for the sale of the ranch, and therefore owed her a personal fiduciary duty; and

-7-

(3) that the Bank, acting as Joan's financial adviser, owed her a fiduciary duty and that this duty flowed to all the bank's officers, including Wachholz.

Upon review of the testimony, we conclude that the existence of a true agency relationship between either the Bank or Wachholz and Joan is unsubstantiated. Unlike the trial court, we find no evidence to suggest that either the Bank or Wachholz were authorized to negotiate a sale of the ranch or to direct to Joan only those prospective buyers whom the bankers deemed appropriate. Thus, any fiduciary duty owed to Joan by the Bank and its officers had to arise from the Bank's role as Joan's financial advisor.

The relationship between a bank and its customer is generally described as that of debtor and creditor, State v. Banking Corp. of Montana (1926), 77 Mont. 134, 251 P. 151, and as such does not give rise to fiduciary responsibilities. Neverthless, there are exceptions in certain situations:

> "As a general rule, the relationship between a bank and a depositor or customer does not ordinarily impose a fiduciary duty of disclosure upon the bank. They deal at arm's length. [citations omitted] However, special circumstances may dictate otherwise: one who speaks must say enough to prevent his words from misleading the other party; one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party; and one who stands in a confidential or fiduciary relation to the other party to a transaction must disclose other facts. [citation omitted] Present-day commercial transactions are not, as in past generations, primarily for cash; rather, modern banking practices involve a highly complicated structure of credit and other complexities which often thrust a bank into the role of an advisor, thereby creating a relationship of trust

and confidence which may result in a
fiduciary duty upon the bank to disclose
facts when dealing with the customer.
[citation omitted]"

Tokarz v. Frontier Fed. Sav. & Loan Ass'n. (1983), 33

Wash.App. 456, 656 P.2d 1089, 1092. See also Dolton v.

Capitol Fed. Sav. & Loan Ass'n. (1981 Colo.App.), 642 P.2d

21. See generally Annot., 70 A.L.R.3d 1344 (1976) (existence

under special circumstances of fiduciary relationship

between bank and depositor or customer so as to impose

special duty of disclosure upon bank).

The existence of a fiduciary duty to a loan customer

depends upon satisfactory proof of a special relationship.

In Stewart v. Phoenix Nat'l Bank (1937), 49 Ariz. 34, 64

P.2d 101, the Arizona Supreme Court held that:

"[w]here it is alleged [that] a bank has
acted as the financial advisor of one of
its depositors for many years, and that
the latter has relied upon such advice,
it is a sufficient allegation that a
confidential relationship in regard to
financial matters does exist and that, if
it is proved, the bank is subject to the
rules applying to confidential relations
in general."

49 Ariz. 34, 64 P.2d at 106. Accord: Fridenmaker v. Valley

Nat'l Bank of Ariz. (1975), 23 Ariz.App. 565, 534 P.2d 1064;

Bank of America v. Sanchez (1934), 3 Cal.App.2d 238, 38 P.2d

787; Lloyds Bank, Ltd. v. Bundy [1974], 3 All.E.R. 757

(C.A.) (English Court of Appeal, Civil Division) (Opinion of

Sir Erich Sachs). Similarly, in Pigg v. Robertson (1977

Mo.App.), 549 S.W.2d 597, the Missouri Court of Appeals held

that evidence that a banker was aware he was being called

upon to advise a customer on obtaining a loan for purchase

of real estate would entitle a jury to find that a

confidential relation existed and that certain disclosures

by the customer to the banker should be protected, and that disclosures by the banker to the customer of any adverse interests on the former's part should be encouraged.

There is substantial, credible evidence in the case at bar that the relationship between the Conrad National Bank and Joan Deist was more than a simple debtor-creditor affair. Joan and her husband had dealt with the bank for about twenty-four years prior to his death. Both she and Russell had imposed trust and confidence in the advice of Eugene Gillette, who as an officer was the alter-ego of the enterprise and, for all practical purposes, was the "bank" to Joan and other customers. See Independent Banker's Ass'n of Georgia, Inc. v. Dunn (1973), 230 Ga. 345, 197 S.E.2d 129, appeal after remand, 231 Ga. 421, 202 S.E.2d 78, appeal after remand (1976), 237 Ga. 252, 227 S.E.2d 227. Gillette acted as a financial advisor to Joan after Russell's death with respect to handling the ranch debt. Even though Joan's association with the Bank in this transaction did not extend over several years, the nature of the association and her reliance, combined with her husband's years of dealings with the bank on essentially the same matters, were sufficient to make out a prima facie case that a fiduciary relationship existed. Even appellants Wachholz, Dittman and Nelson have conceded that the Bank might have been in such a relationship and had such a duty under these facts.

Appellants principal concern, however, is how Wachholz, as a bank officer, is vested with a duty or responsibility to Joan. Appellants emphasize that Wachholz did not act in the same capacity as Gillette. Wachholz never advised Deist on her financial situation and how she

might cope with it. He did agree to help Joan find a buyer for the ranch, and he did tell her that selling to Dittman would amount to a "good deal," but there is no evidence that he participated in negotiations between Joan or her attorney and Dittman. Appellants point to this lack of evidence as satisfactory proof that Wachholz was not acting in the role of confidant and advisor and could not therefore be vested with fiduciary responsibilities.

Nevertheless, the court found that because "the officers of the Conrad National Bank were Joan's financial and business advisors and because she reposed trust and confidence in them, the officers of the bank owed to Joan Deist a fiduciary duty. That fiduciary duty extended to Paul Wachholz . . . " Presumably, the court was convinced that, because Eugene Gillette, and perhaps Roy Deming, acted as financial advisors to Joan respecting the sale of the ranch, any fiduciary duty vested in them carried over to any other bank officer involved in the transaction, including Wachholz. This presumption appears well grounded in precepts of agency, so long as the duty imposed does not extend beyond the scope of the Bank's or Wachholz's association with the sale of the Deist ranch. Appellants argue that Wachholz cannot be held liable merely because the Bank fails to discharge affirmative duties which it owes to a third person. This argument, however, misconceives the nature of Wachholz's duties and any liabilities arising from the breach thereof. As noted above, the duty extends no further than his involvement with the land sale. Appellants' fear that innocent employees could be made to suffer for the sins of errant coworkers is assuaged by the

rule that the agent of a disclosed principal (here, the Bank) is not subject to liability for the conduct of other agents unless he is at fault in cooperating with them. See Restatement (Second) of Agency, Section 358 (1957).

We recognize that most, if not all, of the cases relied upon to support the trial court's finding of a fiduciary duty involve fact situations different than those in the immediate dispute. Nevertheless, the ratio decidendi of these decisions is not incompatible with the facts of the case at bar. The Bank acted as Joan's financial advisor, and she undoubtedly relied upon their counsel. Equity is not compromised by holding Wachholz to a fiduciary duty to Joan in those dealings intimately associated with the offices of the Bank, so long as the duty reaches no further than the internal association that gave rise to it. The Bank was unquestionably involved in the sale of the ranch, and Wachholz was not so detached from the transaction that imposition of fiduciary responsibilities would be impermissible. Appellants' retort that innocent bank employees would always suffer unjustly because of another employee's indiscretions is unwarranted.

In summary, Wachholz had an obligation to inform Joan fully as to his involvement in the ranch purchase and to do nothing which would place Joan at a disadvantage. He was bound to insure that Joan was not "insufficiently informed of some factor which could affect [her] judgment." Bundy, supra, at 768. We are not saying that Wachholz could not make a "reasonable legitimate profit" from his dealing with Joan, so long as he disclosed fairly and honestly all the information which might be presumed to have influenced her

in the transaction. Cf. Stewart v. Phoenix Nat'l Bank, supra, 49 Ariz. 34, 64 P.2d 101, 106 (bank owing fiduciary duty to client in transaction may make reasonable legitimate profit from client so long as bank fully discloses all facts presumed to influence client in the transaction).

PROOF OF CONSTRUCTIVE FRAUD AND UNDUE INFLUENCE

According to Section 28-2-406, MCA, constructive fraud consists of:

> "(1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or (2) any such act or omission as the law especially declares to be fraudulent without respect to actual fraud."

Clearly, subsection (1) of Section 28-2-406 is at issue here, even though respondent relies upon some case law construing subsection (2). Appellants have also muddied the waters with references to the nine elements of actual fraud, which have nothing to do with proof of constructive fraud. See Moschelle v. Hulse (Mont. 1980), 622 P.2d 155, 37 St.Rep. 1506. Consequently, the following discussion will address only those factual and legal issues pertinent to subsection (1).

The trial court found a breach of duty on Wachholz's part by concluding that (1) the contract price and terms were disadvantageous to Joan; (2) the true purchasers were undisclosed to her; and (3) the property was used by the buyers for purposes other than those contemplated by Joan.

With respect to the contract price, it should be remembered that Joan and Dittman agreed to a total sales price of approximately $558,000, which included the land and

farm equipment. This figure was higher than that proposed in the unsuccessful negotiations between Joan and Dr. Vranish, the only other figure that was the result of actual negotiations. Nevertheless, the trial court's attention was not focused on the Vranish figure. Instead, the court considered two varying estimates of the fair market value of the ranch as of January 2, 1979, the date of sale. Joan's appraiser, Roger Jacobson, valued the property at about $870,000, or about $300,000 over the actual contract price. Appellants' appraiser, Wayne Neil, testified that the property was worth about $515,000, just slightly under the contract price. In its findings of fact, the trial court makes mention of the $870,000 figure, but found that the fair market value as of January 2, 1979, was $635,000.

There is only one possible source for the latter figure. During her testimony, Joan indicated that she consulted another appraiser named Zugliani sometime after the sale. This appraisal produced a value of $635,000. Zugliani was not called as a witness, and his report was not entered into evidence. Under the circumstances, it is arguable whether the court's finding should be upheld. The figure adopted by the trial court is based on data that could not be cross-examined by appellants. Nevertheless, the court's implicit recognition of the Jacobson appraisal of $870,000 suggests that the fair market value of the ranch on the date of sale was substantially higher than the actual contract price. The expression of market value in specific dollars is not as important as the fact that the value was higher than the agreed contract price.

Although we regard the trial court's acceptance of the

$635,000 figure as harmless error in this case, this does not absolve the court from its failure to explain why one appraiser's figure should be believed over that of another. In marriage dissolution and property settlement cases, this Court has expressed dissatisfaction with district court findings on valuation that skip the essentials of elaboration:

"As a general rule, if contested evidence is presented to the trial court regarding the existence or valuation of marital assets and no findings are made regarding that asset or no explanation is provided as to why the District Court accepted one party's valuations over that of the other, the District Court has abused its discretion. Peterson v. Peterson (1981) Mont., 636 P.2d 821, 38 St.Rep. 1723. Item-by-item findings are not required in property division cases, but findings nevertheless must be sufficiently adequate to ensure that this Court need not succumb to speculation while assessing the conscientiousness or reasonableness of the District Court's judgment. In re the Marriage of Caprice (1978), 178 Mont. 455, 585 P.2d 641.

". . .

"This Court cannot uphold [a] District Court's judgment as within the realm of its broad discretion if we have no inkling of its thought process."

Larson v. Larson (Mont. 1982), 649 P.2d 1351, 1354, 39 St.Rep. 1628, 1631-32. The same principle should be followed by trial judges in all future cases involving valuation of real estate.

Evidence was submitted challenging the other contract terms. Much if not all of it came through the testimony of attorney Milton Datsopolous, who was called by Joan as an expert in the field of real estate transactions. In answer to a question about a hypothetical sale similar to the one to appellants, Datsopolous indicated that the Deist contract

was "tilted very much so in favor of the purchasers." Specifically, Datsopolous faulted the sales price as being below market value, the interest rate as being below prevailing rates in the area, and the annual payments as being lower than usual. Datsopolous also criticized the deed release provisions for giving appellants the opportunity to sell off choice parcels, thereby jeapordizing any interest or value Joan would have in the land if the parties terminated the contract and allowed all legal and equitable interests to revert to Joan.

Datsopolous did not examine the escrow files of the Bank or make independent studies of interest rates other than to speak to his experience as a real estate speculator in the area and as a director of the bank in Columbia Falls, Montana. He did not conduct an independent appraisal of the Deist property. Nevertheless, appellants did not attempt to challenge his status as an expert witness. However, they did rely on testimony from other witnesses that the contract was the result of honest bargaining. For example: attorney Murphy testified that, in his opinion, he had negotiatied a good deal on Joan's behalf. Wachholz testified that, in other real estate purchases he participated in shortly before the Deist purchase, he was giving a slightly lower interest rate on contracts, although Dittman admitted that the interest rate on future sales of sections of Deist land was nine-and-one-half percent (9-1/2%).

The trial court obviously accepted Datsopolous' testimony that the contract was more favorable to the purchasers. His testimony is, for the most part, uncontradicted and credible. Because this Court will not

disturb findings based on substantial though conflicting evidence, unless there is a clear preponderence of evidence against such findings, Toeckes v. Baker (Mont. 1980), 611 P.2d 609, 37 St.Rep. 948, the trial court's observation that the contract terms were more favorable to appellants withstands challenge.

The matter of whether Joan knew Wachholz and Nelson were involved in the purchase also involves consideration of conflicting testimony. Joan insists that she never knew these individuals were partners in the Dittman purchase, even though she knew at one time that Wachholz had expressed to her an interest in possibly joining as a co-purchaser. Wachholz contends that Joan was aware he would be a buyer before the contract was signed, and that her attorney, Murphy, corroborated this testimony. Gillette thought it best that Wachholz inform Joan if he intended to join Dittman, as that would be proper policy for a bank employee. The court again chose to believe Joan and we can find no acceptable reason to question that judgment.

The interesting aspect of the disclosure matter is whether Joan knew that Dr. Nelson was a purchaser. Gillette testified that Joan came into his office sometime after the sale and told him that Nelson "was involved in buying the ranch and had she known it, she would not have sold it to them." This testimony was corroborated by Nelson himself. He indicated that when he first saw Joan after the sale, she expressed displeasure with his involvement, and again said that had she known he would be a co-purchaser, she would never have signed the contract. There was no indication at trial why Joan looked upon Nelson's involvement with

disfavor, but it does appear that she did not know of his interest, even if it can be argued that she knew or had reason to know that Wachholz was involved.

Although the trial court concluded that appellants "intended to use the property for purposes other than those represented to Joan before the sale," Joan's "intentions" were somewhat cloudy. She testified that it was always her intention to have the ranch remain in agricultural use, but she admitted that the ranch was unprofitable and that the sale of some acreage was inevitable. Moreover, she agreed to deed releases in the Dittman contract, to begin in 1980, even though she had rejected the Vranish proposal, which included provisions for deed releases beginning in 1985. Dittman maintained that Joan never told him directly that she wanted the land maintained as a ranching unit, but he admitted hearing rumors to the contrary. Once again, the trial court was forced to weigh conflicting testimony, and chose to believe Joan, even though her entire testimony on the matter was confusing and possibly contradictory. Nevertheless, even if we concede that Joan had full knowledge of the appellant's actual intentions, such an admission is not fatal to the ultimate finding of constructive fraud.

Two other considerations affecting the alleged breach of duty must be addressed. The first was the introduction into evidence of the so-called "Bowler Report," the results of an internal audit of the Conrad National Bank conducted in 1980. Bowler appeared as a witness for appellants, although his report, submitted during presentation of Joan's case-in-chief, was potentially damaging to Wachholz. The

-18-

report concluded that the bank had made loans to individuals, partnerships and companies in which Wachholz had financial interests. All were real estate projects. Wachholz's personal net worth had increased nearly $2,000,000 in the years between 1972 and 1980, and the increase was due primarily to his real estate investments. The audit found nothing illegal in these transactions, principally because the Bank did not have a clear conflict of interest policy. However, the audit concluded that because of his "extensive outside interest," Wachholz's lending authority should be curtailed or eliminated and brought into compliance with a formal conflict of interests policy.

The other consideration was the role played by Joan's attorney, James Murphy, during the negotiations. Appellants cannot conceive how Joan could assert that her best interests were unprotected when she was represented by counsel. Admittedly, Joan was not present during many of the meetings, although Murphy testified that he had counseled Joan on all important decisions and had striven to get the best possible deal for her. Murphy's testimony does not describe the negotiation process beyond his generalizations about protecting Joan's best interests. He did indicate, however, that he did not advise Joan on the difference between various interest rates, or about the legal significance of a "trustee." As noted earlier, Murphy claimed that Joan was aware of Wachholz's involvement, but his testimony is silent as to his knowledge of Nelson's interest. Obviously, the court was unimpressed with his representation, and possibly regarded portions of his

testimony as revealing less than a yeoman's effort on behalf of Joan.

Considering together the testimony about contract price and terms, the allegations about disclosure, the alleged misrepresentations of intended use of the land, Wachholz's past activities, and attorney Murphy's role, we cannot say that the trial court erred in finding a breach of duty amounting to constructive fraud. There is substantial credible evidence that the contract terms favored appellants at Joan's expense, and the fact that she was represented by counsel does not mitigate any harm suffered by her. Wachholz breached his fiduciary duty and failed to consider Joan's best interests.

The court also found that the evidence supported a finding of undue influence, relying on Section 28-2-407(1), MCA, which provides, in pertinent part, that undue influence "consists in . . . the use by one in whom a confidence is reposed by another . . . of such confidence . . . for the purpose of obtaining an unfair advantage over him." This subsection has apparently never been construed by this Court, and there is little guidance from the California courts as to the scope of identical language in Cal.Civ.Code Section 1575(1) (West 1982). As a general rule, however, a presumption of undue influence arises from a transaction between individuals in a fiduciary relationship where the dominant party in the relationship is the beneficiary of the transaction. See 25 AmJur 2d Duress and Undue Influence Section 39 (1966). Presumably, however, the dominant party must exert some kind of unfair presuasion over the victim. Id. Because Wachholz never negotiated directly with Joan,

and because there was no evidence of unfair persuasion on Wachholz's part when he told Joan about the Dittman proposal, it seems clear that the presumption of undue influence was successfully rebutted by the testimony of several parties, including Joan. Nevertheless, the available evidence still supports the finding of constructive fraud.

## THE APPROPRIATENESS OF RESCISSION

Section 28-2-1712(1), MCA, requires the party aggrieved by the contract to "rescind promptly upon discovering the facts which entitle him to rescind . . ." Because Joan allegedly took several months to seek rescission, appellants argue that pursuit of the remedy is barred by laches. It is unnecessary, however, to inquire into the time frame in which Joan acted. Laches is an affirmative defense and must be set forth in a defendant's answer. Rule 8(c), M.R.Civ.P. Appellants, however, did not raise this defense in answers to the initial and amended complaints, and it cannot be raised for the first time on appeal. Moschelle, supra, 622 P.2d at 160, 37 St.Rep. at 1511.

Appellants also maintain that rescission is improper because Dittman, not Wachholz, was the "actual" purchaser, and because Dittman (and Nelson) did not breach any duty to Joan and therefore cannot be held liable to rescind. This argument is an unpersuasive exercise in semantics. Wachholz was a "purchaser" by virtue of his partnership with Dittman and Nelson to buy the ranch. Moreover, Section 28-2-1711(1), MCA, apparently allows for rescission against all the parties even though the sole "wrongdoer," Wachholz,

did not participate in the negotiations or the signing. The statute provides that the aggrieved party may rescind his contract if his consent "was . . . obtained through . . . fraud, or undue influence exercised by or with the connivance of the party as to whom he rescinds or of any other party to the contract jointly interested."

VALUATION OF AMOUNTS DUE UNDER THE JUDGMENT

In the judgment, the court ordered appellants to pay Joan $11,122 in rent for each year or part thereof when they were in possession of the ranch, or $35,072 total. In addition, the court ordered appellants to tender the $171,000 they earned from sale of the parcels after purchase of the ranch. Both sums were to be applied as a set-off to the $249,512.48 that Joan had received from the sale of the ranch between January 1979 and the time of judgment. Appellants maintain that the computations behind these set-offs are in error.

The $11,122 per year rental payment is based on an esimate of annual net income derived from the Neil appraisal, the report commissioned by appellants. Apparently, this figure is based upon an assumption that approximately $100,000 of additional capital improvements would have to be made on the property to generate that net income. Under the circumstances, the figure used by the trial court could be considered erroneous. We note, however, that this figure represents the net return after expenses on a gross return of approximately $25,000 per year. This $25,000 figure appears to be akin to an average estimate of gross returns ranging from approximately $6,250 per year to over $35,000 per year, depending upon the basis

of renting or leasing agricultural property. The low figure reflects a pure cash rental method. The high figure reflects a combination of crop and calf sharing. A third method contemplates operating the ranch strictly for cattle raising, and gives a rental figure of $22,725, a sum very close to the $25,000 used as a gross return. Given that all three bases for renting or leasing agricultural property are observable in the vicinity of the Deist ranch, and given constant annual expenses of operation, the $11,122 annual rental payment ordered by the court as a set-off does not appear excessive or unreasonable. Even when we grant that the figure has some connection to gross income from greatly improved property, it still appears to approximate closely a fair net return on property not substantially improved. Because of this close proximity, we are reluctant to overturn this portion of the trial court's judgment.

We do not agree with the trial court that appellants must "tender" to Joan in the form of a set-off the full $171,000 owed to them under the contracts for sale of the parcels. Appellants note that the $171,000 is not yet in their hands. This is a sum owing to them over the periods of the contracts. The present value of any sum due in the future, whether in installments or lump sum, is worth less today. See A. Alchian & W. Allen, Exchange and Production: Theory in Use, 264 (1969); R. Heilbroner, Understanding Macroeconomics, 118-19 (4th ed. 1972). Any set-off involving the sale of the two parcels should amount to no more than the present value of the $171,000 to be earned over the life of the sales contracts. The trial court should have examined the period that the contracts were in

effect prior to delivery of the warranty deeds and applied an appropriate discount rate to the total sales price in order to reflect present value.

JUDGMENT

Those portions of the District Court's judgment involving the finding of a fiduciary duty and a breach of that duty amounting to constructive fraud are affirmed. The requirement that $11,122 in rent for each year or part thereof appellants were in possession of the ranch be applied as a set-off to the amount owed by Joan under the terms of rescission is also affirmed. That portion of the judgment requiring treatment of the full $171,000 owing on the two contracts for deed as a set-off is reversed, and the case is remanded to the District Court for additional proceedings to determine the present value of the amounts owing to appellants under those contracts and to enter an appropriate judgment.

_____
Honorable Henry Loble, District
Judge, sitting for Mr. Justice
Frank B. Morrison Jr.

We concur:

_____
Chief Justice

_____

_____

-24-

_Daniel J Shea_

_John C Shelley_

Justices

Mr. Justice L.C. Gulbrandson dissenting

I respectfully dissent.

After citing Stewart v. Phoenix National Bank (1937), 49 Ariz. 34, 64 P.2d 101, for the existence of a bank's fiduciary duty to a loan customer, the majority opinion states: "The Bank was unquestionably involved in the sale of the ranch and Wachholz was not so detached from the transaction that imposition of fiduciary responsibilities would be impermissible."

I quote from the next case cited by the majority, Fridenmaker v. Valley National Bank of Arizona (1975), 23 Ariz.App. 565, 534 P.2d 1064, 1070:

> "Fridenmaker has previously alleged that he was in a confidential relationship with the Bank and that this relationship forces this court to examine the right to rely in that light. It is contended that the length of time he dealt with the Bank, the receipt of credit lines on a signature, the intermittent advice given by the Bank, all, if proven, indicate a confidential relationship. Stewart v. Phoenix National Bank, 49 Ariz. 34, 64 P.2d 101 (1937). We agree that this is a correct statement of law and will concede, for argument's sake, that initially a confidential relationship existed. The presence and participation of counsel representing Fridenmaker interests was so prevalent, however, as to leave any confidential relationship that existed of nugatory legal effect."
> (Emphasis added.)

Here, the plaintiff was represented by attorney James Murphy throughout all negotiations for the sale of the ranch after Mr. Diest's death. Attorney Murphy was instrumental in drawing the proposed contract to Dr. Vranish, and in fact testified that he told Dr. Vranish the offer of $800 per acre was too low. When the Vranish negotiations ended,

-26-

attorney Murphy, after consultations with the plaintiff, obtained information from the plaintiff's accountant, Harry Isch, regarding terms of down payment, annual payments and release provisions, and then drew the final contract with Dittman, trustee, at $1,050 per acre.

Attorney Murphy testified as follows:

"Q. With reference to Mr. Isch, what did he do in the continuing negotiations over the summer and autumn?

"A. I consulted with him about the amount of money we could take down on the Ranch. I consulted with him about the payments. I particularly consulted with him about release provisions, because we didn't want a whole bunch of money to be coming in in any one year where--and let too much of it go to income tax."

" . . .

"Q. All right. Do you remember, Mr. Murphy, a conversation with Dr. Vranish with reference to an eight hundred dollar per acre figure?

"A. Yes.

"Q. What did you say to Dr. Vranish with reference to that conversation?

"A. He said he was going to talk to Joan about it, and I asked him not to.

"Q. Why?

"A. Well, because they were real good friends. And if he was going to talk to her, I felt that he was going to try to get her to take eight hundred dollars an acre. And I asked him not to, because she needed the money a lot more than he did, because that was all she had to live on. And he had a medical practice to keep him going. And I told him that we could get more than that for it.

"Q. Did you get more than that?

"A. We got one hundred [sic] thousand and fifty for it.

"Q. Okay. In your best judgment as her counsel, Mr. Murphy, do you believe that

-27-

was a fair price for the sale at that time of the land?

"A. I thought we had made a heck of a good deal."

In my view, the knowledge of the purchasers, and of all the terms of the contract, by the plaintiff's attorney and accountant, rendered the existence of any fiduciary relationship between Paul Wachholz and the plaintiff of little legal effect.

In addition, the majority correctly states Montana law regarding the appropriateness of findings by a trial judge, but then ignores that case law, with the admonition that trial judges should comply in future cases involving valuation of real estate. Here the trial court found the market value of the Deist ranch at the time of sale was $635,000. The testimony to that figure was by the plaintiff that she consulted an appraiser named Zugliani about ten months after the sale and that his appraisal value was $635,000. Zugliani was not called, his appraisal was not offered by the plaintiff, and no foundation was made regarding qualifications, acreage appraised, or appraisal methods used.

The trial court also found that the annual rental value of the ranch was $11,122. That figure could only have come from the report of the purchaser's appraiser, Mr. Wayne Neal, and was clearly based on the assumption that approximately $100,000 of ditch improvements would have to be made first to generate that income. In addition, the plaintiff herself testified that the ranch had not shown a profit in the ten-year period preceding the sale of the ranch.

-28-

The trial court further ordered an immediate set off in favor of the plaintiff of the proceeds of the two sales made by the appellants even though the sales were made on contract. In essence, the judgment converted a contract receivable into a cash payment without consideration of any discounted value.

Because I believe erroneous findings and conclusions were entered, I would reverse and remand for a new trial.

_____
Justice