534 P.2d 1064

James Marvin **FRIDENMAKER** and Lorena Mae Fridenmaker, his wife, and Henry C. Fridenmaker, Jr., and Bonnie Jean Fridenmaker, his wife, Appellants,
v.
The **VALLEY NATIONAL BANK OF ARIZONA**, a National Banking Association, Appellee.

No. I CA–CIV 2278.

Court of Appeals of Arizona,
Division 1,
Department A.

May 6, 1975.

Rehearing Denied June 13, 1975.

Review Denied July 10, 1975.

Law Offices of Jack E. Evans, Ltd., by Jack E. Evans, Phoenix, for appellants.

Rawlins, Ellis, Burrus & Kiewit, by Dennis M. Balint, Michael V. Mulchay, Phoenix, for appellee.

## OPINION

OGG, Presiding Judge.

James M. Fridenmaker, his wife Lorena, Henry C. Fridenmaker and his wife Bonnie (Fridenmaker) appeal from a directed verdict in favor of defendant appellee Valley National Bank (Bank). On appeal from a directed verdict this court views the evidence and all reasonable inferences in a light most favorable to appellant. Hudlow v. American Estate Life Insurance, 22 Ariz.App. 246, 526 P.2d 770 (1974); Heth v. Del Webb's Highway Inn, 102 Ariz. 330, 429 P.2d 442 (1967). Guided by that concept the relevant facts are:

Fridenmaker began dealing with the Bank in 1949. A line of credit was obtained and then it was drawn on throughout the year. The farming operation necessitated a cash flow and the Bank provided it in return for unsecured promissory notes. As the Fridenmaker farming operation expanded, it was decided that it would be more profitable to farm on owned rather than leased land. Consistent with that, Fridenmaker began purchasing large parcels of land on which farming operations could be continued.

In 1965 Fridenmaker suffered a heavy crop loss due to unprecedented rainfall. As a result the farming year was financially unsuccessful and the Bank loan went unpaid. In 1966, as a result of an infestation of foreign wire worms and bollworms, Fridenmaker again encountered an unprofitable year. At the end of this two year period Fridenmaker owed the Bank $380,000 on an unsecured line of credit.

In late 1966 and 1967 the Bank, represented primarily by Dorrance E. Cruikshank, informed Fridenmaker that a mortgage was required on all the Fridenmaker properties to secure the $380,000 debt. Fridenmaker objected to a blanket mortgage, claiming that the value of the properties was many times greater than the amount owed and that a mortgage on less than all of the properties would be sufficient. Neither the Bank nor Fridenmaker had obtained a professional appraisal of the land. Fridenmaker also informed the Bank that, if a blanket mortgage was taken on all the land, it would be extremely difficult to meet ordinary expenses. In addition, it was pointed out that when crop proceeds were insufficient, it was sometimes necessary to refinance properties in order to meet current expenses. Fridenmaker requested that a clause be placed in the mortgage which would require the Bank to give releases on certain lands if they were to be sold. It appears that Cruikshank refused to put the term in the mortgage instrument but did say that the Bank would give releases if the Bank's position was not jeopardized. It also appears, in the light most favorable to Fridenmaker, that when a due date of December 31, 1967 was proposed he protested, declaring that he would be unable to repay the loan by that time. In response, Cruikshank told Fridenmaker that a realistic repayment schedule would be devised and that the Bank would work with them. The Bank also stated that it would exclude crops from the lien of the blanket mortgage.

After these preliminary negotiations were entered into Fridenmaker unsuccessfully attempted to secure a loan from other institutions in order to pay the debt owed to the Bank. Fridenmaker also conferred with his accountant and attorney concerning the arrangements proposed by the Bank.

Prior to the execution of the mortgages a meeting was held at the Bank. It appears that Fridenmaker, the accountant and the attorney were present at this meeting. At that time counsel for Fridenmaker, who was there to present Fridenmaker's position, once again requested that release provisions be put in the mortgage. This request was again refused by Cruikshank.

On May 25, 1967 Fridenmaker signed a promissory note, four mortgages and a collateral assignment. The mortgages did not include crops in the lien; there was no release clause in the instrument; the due date for repayment was December 31, 1967; there was no statement of position regarding the refinancing of property under mortgage. These instruments were reviewed by counsel for Fridenmaker before signing. Fridenmaker claims, however, that certain oral promises were made by the Bank that induced Fridenmaker to enter into the agreement. These promises were: (1) the Bank would not interfere with crop proceeds and would exclude them from the lien of the blanket mortgage; (2) releases would be given in the event of the sale of property if the Bank's position was not jeopardized; (3) a realistic repayment schedule would be worked out in spite of a December 31, 1967 due date; (4) the Bank would not interfere with refinancing as long as their security was not jeopardized.

On April 21, 1970, approximately two years and four months after the original amount owed was due, the Bank filed a foreclosure action. On September 20, 1970 the Fridenmakers filed a counterclaim. On October 21, 1970 the Bank was paid in full by Fridenmaker and the foreclosure complaint was dismissed. Fridenmaker proceeded, however, on the counterclaim and after presenting the case to the jury the cross-defendant Bank was granted a directed vredict.

Fridenmaker alleged three causes of action against the Bank: Fraud, promissory estoppel and interference with contractual relationships. The Bank was granted a directed verdict on each of these issues and Fridenmaker now appeals.

■ Arizona's requirements for proof of actionable fraud are very strict. There

are nine elements to an actionable fraud: (1) a representation; (2) its falsity; (3) its materiality; (4) speaker's knowledge of its falsity or ignorance of its truth; (5) intent that it should be acted upon; (6) hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon, and (9) his consequent and proximate injury. Equally fundamental is the proposition that failure to prove any one of the essential elements is fatal to the cause of action. See, e. g., Moore v. Meyers, 31 Ariz. 347, 253 P. 626, rev'd on other grounds, 31 Ariz. 519, 255 P. 164 (1927); Lehman v. Whitehead, 1 Ariz.App. 355, 403 P.2d 8 (1965).

 The first element which must be proved is that a representation was made. Normally the representation must be of a fact which exists in the present and not merely a promise to perform some future act. However this general rule is subject to an exception; when a promise is made to perform an act in the future and the promissor has no intention at the time the promise is made to perform that act, the representation is of the sort that can give rise to an action for fraud. Waddell v. White, 56 Ariz. 420, 108 P.2d 565 (1940).

Fridenmaker makes three arguments which he believes, at minimum, raises a question of fact for the jury regarding the Bank's intention to perform the promise at the time it was made. First, he contends that the Bank executed a preconceived scheme against him in order to obtain the land. This scheme, argues Fridenmaker, is supported by seven evidentiary matters:

"A. The Bank *intentionally* valued the Fridenmaker properties at *small fractions* of their actual value.

B. The falsified values were submitted to the Bank examiner to *evoke* criticism of the . . . loan.

C. The Bank informed the Fridenmakers it must have a mortgage on *all* of their properties to 'satisfy the Bank Examiner.'

D. After making the promises to Fridenmakers to induce them to execute the mortgages, the Bank immediately thereafter *repeatedly and systematically breached all of its promises.*

E. The Bank arranged with the first mortgagee, Northwestern Mutual Life Insurance Company, that Northwestern would accelerate its mortgage loan to the Fridenmakers and foreclose at the same time the Bank foreclosed, thereby requiring approximately $1,000,000 cash to bid in the properties at the foreclosure sale.

F. The Bank took deliberate and intentional steps to *prevent* the Fridenmakers from completing sales of portions of the properties which would have *paid* the Bank *in full.*

G. The *Bank* had arranged to bid in some of the properties at the foreclosure sale and, according to the testimony of [ a Bank official] would have resold some of the properties *for a $2,3000,000 profit.*"

 These supportive evidentiary matters stated by counsel are only opinions. When reviewing a directed verdict on appeal, all the evidence and *reasonable* inferences which can be drawn therefrom should be construed in favor of appellant. Heth v. Del Webb's Highway Inn, 102 Ariz. 330, 429 P.2d 442 (1967). Mere theory, however, or conjecture or imagination cannot be employed to arrive at a conclusion that fraud has been committed. Queen Insurance Co. v. Jones, 76 Ariz. 198, 262 P.2d 241 (1953). We have carefully considered the record before us and are of the opinion that the trial court was correct in directing a verdict on this issue.

Addressing the specific allegations of Fridenmaker, it readily appears that the conclusions inherent in the allegations are not supported by the evidence.

Allegation A. Neither party had the property professionally appraised in 1967 when these mortgages were given. A certain value was given for the property but we find no evidence which reasonably infers that the initial .evaluation was intentionally valued at a small fraction of actual worth. In fact, Fridenmaker was unable

to find financing elsewhere. Additionally, Fridenmaker knowingly accepted the Bank's position on evaluation. Numerous references to the record are woven into conclusions which allegedly are supportive of Fridenmaker's "evaluation" argument. These references, if dissected objectively, do not support the inferences placed upon them.

Allegation B. This allegation is initially tainted by the statements that the values were "falsified." This is a conclusion which we do not believe is supported by the record. To reach the conclusion which Fridenmaker has—that these "falsified values were submitted . . . to evoke criticism of the Fridenmaker loan"—inference must be coupled with inference until it becomes a purely conjectural allegation.

Allegation C. The record is absolutely barren of evidence to sustain the conclusions drawn by Fridenmaker regarding the Bank Examiner's demand for a mortgage on *all* their property. The record indicates that "The bank examiner . . . was putting pressure on [the Bank] to get the loan paid or get some security" for the loan. This evidence is a far cry from the Fridenmaker allegation, supportive of some fraudulent scheme of the Bank, that "[t]he Bank informed the Fridenmakers it must have a mortgage on *all* of their properties to 'satisfy the Bank Examiners.' "

Allegation D. It is claimed that after promising to exclude crops from the lien of mortgage, "the Bank asserted a lien on crops, interfered with the financing thereof, and demanded an assignment." The record indicates that the Bank did exclude the crops from the lien of mortgage; that the Bank requested, by letter, an assignment of excess proceeds and that Fridenmaker voluntarily did so assign. It is alleged that the Bank failed to execute releases. First, their promise to do so was not unqualified. Second, certain releases were in fact executed. There is, in our opinion, no evidence in the record which can reasonably be said to infer a systematic breach of promises.

In fact, the due date was December 31, 1967. Foreclosure procedures were not undertaken until April, 1970. Releases were executed in three separate instances. In those instances in which releases were refused we find no evidence of bad faith. Conclusions which imply that these decisions were in bad faith are speculative at best.

Allegation E. We find testimony and exhibits which indicate that the Bank was in contact with Northwestern Life Insurance Company and that Northwestern's foreclosure date on Fridenmaker property was known to the Bank. We find absolutely no evidence on which a reasonable inference can be drawn that the Bank colluded with Northwestern to accelerate a foreclosure in order to place Fridenmaker in a cash bind. Such conclusion is so speculative as to be patently unacceptable.

Allegation F. The record in this regard is complex. We find no evidence or reasonable inference therefrom that the Bank interfered with the completion of sales. We do find letters dictating certain conditions under which sales and escrows would be allowed to be completed. We also find evidence in the record which indicates the Bank's attempt to allow sales if these requirements were met. There is no showing that the Bank was not in good faith protecting its own interest at all times.

Allegation G. First, the Bank had a perfect right to arrange for bidding in the property as foreclosure procedures became more imminent. This foreclosure, as previously pointed out, was not instituted for several years after the initial due date. In April, 1970, the loans from 1965 and 1966 had not been paid. The price at which the Bank would have resold the property is irrelevant unless something more is shown. We cannot reasonably infer from the amount stated, from testimony not present in the record, nor from any of the seven allegations of Fridenmaker that the Bank was involved in a preconceived scheme against Fridenmaker. We are aware of the difficulty in proving fraud in sophisti-

cated transactions; we are unable however to allow speculation, which is the result of compounding inferences, to rise to the level urged here.

As an alternative Fridenmaker contends that under the "two circumstances" test of Lusk Corp. v. Burgess, 85 Ariz. 90, 332 P. 2d 493 (1958), it was clearly demonstrated that the Bank lacked a present intention to perform. The "two circumstances" were: (1) the Bank supplied false figures to the Bank Examiner, and (2) the Bank never performed its promises. We have already reviewed both of these contentions which were made for different purposes in the prior argument. We find the allegations unwarranted and accordingly do not believe the "two circumstances" test of Lusk was satisfied. Likewise, we are unable to sustain the Fridenmaker position under the "surrounding circumstances" test of Law v. Sidney, 47 Ariz. 1, 53 P.2d 64 (1936).

Based upon the evidence before the court and the reasonable inferences to be drawn therefrom, we are of the opinion that reasonable minds cannot help but conclude that there was no showing that the Bank, at the time the alleged promises were made, had no intention of performing those promises. Consequently, we affirm the trial court's directing a verdict in favor of the Bank on that theory.

Appellant Fridenmaker next argues that the trial court erred in granting a directed verdict on the promissory estoppel cause of action. We do not agree. The theory of a promissory estoppel is reflected in the Restatement (Second) of Contracts § 90 [1958]:

> "A promise which the promissor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promissee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise."

■ This statement has been adopted in Arizona. Waugh v. Lennard, 69 Ariz. 214, 211 P.2d 806 (1949). It is elementary

that all elements of estoppel must be proved or the action fails. Knight v. Rice, 83 Ariz. 379, 321 P.2d 1037 (1958). It is essential that reliance on the promises of the promissor be adequately demonstrated. Trollope v. Koerner, 106 Ariz. 10, 470 P.2d 91 (1970); Saggau v. State Farm Mutual Ins. Co., 16 Ariz.App. 361, 493 P.2d 528 (1972). Without passing on the question of whether the alleged promises made were legally sufficient, we are of the opinion that the cause of action still fails for the failure to demonstrate reliance.

The record indicates that Fridenmaker, after lengthy negotiations with the Bank, sought financing from other sources. The attempts were unsuccessful. The record is devoid of evidence from which inferences can be drawn that Fridenmaker would not have signed the mortgage except for the Bank's promises. Fridenmaker owed the Bank approximately $380,000. The Bank wanted to be paid or to be secure in its debt. We cannot assume that but for the promises of the Bank that Fridenmaker would not have executed the mortgages. In fact, the records demonstrate he would have. The evidence reveals that after negotiations with the Bank, Fridenmaker consulted counsel about the financial arrangement. Counsel for Fridenmaker then met with Bank officials in an effort to have certain terms desired by the Fridenmakers included in the mortgages. The Bank refused to do so. Before Fridenmaker signed the instruments they were once again reviewed by counsel and certain corrections were made. Only after complex, thorough, hard bargaining was an agreement reached and the instruments signed. We discover no evidence which supports the conclusion that Fridenmaker relied upon the Bank's alleged promises in entering into the agreement.

■ Fridenmaker has previously alleged that he was in a confidential relationship with the Bank and that this relationship forces this court to examine the right to rely in that light. It is contended that the length of time he dealt with the Bank, the

receipt of credit lines on a signature, the intermittent advice given by the Bank, all, if proven, indicate a confidential relationship. Stewart v. Phoenix National Bank, 49 Ariz. 34, 64 P.2d 101 (1937). We agree that this is a correct statement of law and will concede, for argument's sake, that initially a confidential relationship existed. The presence and participation of counsel representing Fridenmaker interests was so prevalent, however, as to leave any confidential relationship that existed of nugatory legal effect. Fridenmaker contends that presence of counsel does not terminate the confidential relationship. Aronoff v. Levine, 190 App.Div. 172, 179 N.Y.S. 247 (1919). We cannot agree. Aronoff is not on point. There, a lien was improperly obtained. It placed the plaintiff under such economic duress as to dispose him to sign a bond in favor of the lienor in an effort to temporarily escape the economic disaster posed by the lien. Counsel represented Aronoff at the time the bond was given. The court, by way of dicta, held that presence of counsel did not alleviate the duress felt by plaintiff at the time the bond was signed. That was not the case here; the money was owed to the Bank, the agreement was not entered to escape the pressure of an improperly obtained lien; Fridenmaker had his choice of means of satisfying the Bank; he was free to sell land or to obtain alternate financing. There was no duress other than that represented by a legitimately owed debt. After negotiation and consultation with competent counsel of his choice, Fridenmaker entered into an agreement with the Bank. We hold that as a matter of law there was no confidential relationship in this case. We conclude that the trial court properly directed a verdict in favor of the Bank on this cause of action.

The third cause of action alleged by Fridenmaker is that the Bank intentionally interfered with the contractual relationships of Fridenmaker. The trial court directed a verdict on this cause of action in favor of the Bank. We are in accord with that decision.

The Bank contends that as a mortgagee it has an absolute privilege to protect its interest in the property. D & S Farms v. Producers Cotton Oil Company, 16 Ariz. App. 180, 492 P.2d 429 (1972).

Fridenmaker, on the other hand, contends that the Bank can exercise only a qualified privilege. Meason v. Ralston Purina Co., 56 Ariz. 291, 107 P.2d 224 (1940). While we agree with Fridenmaker's position, that the Bank has only the right to exercise a qualified privilege, we do not agree that sufficient proof was presented to warrant submission of this issue to the jury. The evidence presented does show that the Bank refused to allow certain sales to go through on the original terms presented to them. There was no showing that the rejections of the original terms presented to the Bank was in bad faith or unreasonable. Had the court allowed this issue to go to the jury it would have been error.

Fridenmaker contends that the trial court committed various errors in its evidentiary rulings. One contention of error concerns the elements of damages. Since there is no occasion for damages to be considered the question is moot.

Fridenmaker also attempted to introduce into evidence a Bank newspaper advertisement which was thought to be relevant in proving his right to rely on the Bank's representation. The particular advertisement was from a newspaper printed approximately five years after the Bank and Fridenmaker entered the agreement. The trial court excluded the ad, holding that it was neither relevant nor material.

We agree with the ruling of the trial court and since we have also determined that Fridenmaker, as a matter of law, had no right to rely; the admission or exclusion of the ad is of no import.

It is also argued that the court erred by refusing to admit two manuals. Our understanding of the record is that the trial court denied admission of the manuals at the time requested by Friden-

maker; however, his ruling was that if a proper foundation was laid the various parts of the manual would be admissible. Fridenmaker had a qualified witness on the stand who was examined concerning various portions of the manual. There was, however, no attempt to introduce the relevant excerpts of the manuals at that time. We are of the opinion that the trial court was correct in refusing admission of the manuals at the time and in the manner presented. Failure of the offer at a proper time, once a proper foundation had been developed, rests with counsel, not with the court.

■ It is argued that the court improperly commented on the evidence. While counsel has failed to cite examples thereof, our search of the record reveals no improper conduct by the court. Fridenmaker contends that the trial court erred by sustaining an objection to certain "state of mind" evidence. We disagree. The witness was asked about his state of mind regarding another's future actions. This is speculative at best and was properly disallowed.

■ Fridenmaker's next objection moves in tandem. It is urged that an attempt to impeach a defense witness, by use of a deposition, was unjustly thwarted when the trial court sustained a hearsay objection to the cross-examination. We disagree. Reference to the dialogue clarifies the issue:

"Mr. Evans: I would like to have the record read back. His testimony was the reason he rejected that is because he had no financial information on Mr. Black.

Mr. Hall: That's right.

Q. By Mr. Evans: Wasn't that your— and your answer was in response to the question: 'Why did you reject it?' You said because you had no financial information on Mr. Black?

A. In response to the question yesterday, yes, that is correct.

\* \* \* \* \* \*

Q. By Mr. Evans: I'm going to refer you back to your deposition taken on December the 18th, Page 136, Line 15.

Q. Do you know whether Mr. Black was a qualified purchaser in terms of financial resources?

A. I did not see a financial statement. I have no knowledge as to his financial position.

Q. Did you ever make any inquiry concerning his financial resources?

A. Yes, I did.

Q. Would you tell me what inquiry you made?

A. At your request I called the banker, I believe, in Cheyenne, Wyoming. The bank in Wyoming advised that Mr. Black was responsible, had always met his obligations and he believed him to be responsible for his commitments.

Q. Do you recall that the banker with whom you conferred was named Kurrance?

A. Yes, I believe that was the name."

Up to this point in the examination everything was proper. The witness Cruikshank testified that he had no financial information concerning Mr. Black. Counsel for Fridenmaker then properly impeached that testimony by use of a prior deposition of Cruikshank. This method effectively accentuated the conflict in the witnesses's testimony. However, counsel for Fridenmaker then pursued the inquiry:

"Q. Did Mr. Kurrance state to you whether in his opinion Mr. Black was qualified to make the acquisition upon the terms indicated?

Mr. Hall: Just a moment. I'll object to this coming in now as being hearsay. What Mr. Kurrance told Mr. Cruikshank is hearsay, if Your Honor please.

The Court: Sustained.

Mr. Evans: Well, Your Honor, we have an exception to the hearsay rule for the impeachment purposes, not to prove the truth of what was uttered but to prove he did in fact have financial information."

**574**

Mr. Evans recited a correct statement of law. See, McCormick, Law of Evidence, § 39 (1954). However, it had already been demonstrated that the witness, at another time, admitted having financial information and the inconsistency had already been demonstrated. The information which counsel attempted to elicit here was unnecessary and was hearsay. The purpose was no longer to prove the fact that he had financial information but rather to prove what the information was. This was properly excluded.

The final contention is that the trial court erred by preventing the impeachment of Cruikshank, an officer of the Bank, by the use of a pleading verified by another Bank officer. We agree. It is recognized in Arizona that:

"[s]tatements in a pleading which are satisfactorily shown to be those of the party or to have been approved by him are admissible against the party making them . . . as proof of the facts admitted therein. Buehman v. Smelker, 50 Ariz. 18, 27, 68 P.2d 946, 950 (1937)."

The party to the action is the Bank. The Bank speaks through its authorized employees. Consequently, when one authorized employee signs a pleading denying a certain allegation and a second authorized employee makes a contradictory statement, then impeachment of the second employee by the use of a pleading signed by the first is proper.

The court's error has little, if any, effect. The credibility of Cruikshank was pertinent primarily as it related to whether certain promises were made. This appeal has assumed, without deciding, that they were. We do not believe that admission of the excluded impeachment testimony would have, if the case had reached the jury, affected a verdict or affected the court's directed verdict. The error was technical, not reversible. Wigley v. Whitten, 78 Ariz. 224, 278 P.2d 412 (1955).

Having reviewed all contentions presented by appellant Fridenmaker and having found no reversible error the judgment of the trial court is affirmed.

DONOFRIO and STEVENS, JJ., concurring.