985 P.2d 596

**INTER–TEL, INCORPORATED, an Arizona corporation, Plaintiff, Counterdefendant–Appellant,**

v.

**BANK OF AMERICA, ARIZONA, an Arizona corporation, Defendant, Counterclaimant–Appellee.**

No. 1 CA–CV 98–0178.

Court of Appeals of Arizona, Division 1, Department D.

Jan. 26, 1999.

Review Denied Sept. 21, 1999.

Cohen Kennedy Dowd & Quigley, P.C. by Ronald Jay Cohen, Daniel P. Quigley, Laura H. Kennedy & Robert N. Mann Phoenix, Attorneys for Plaintiff, Counterdefendant–Appellant.

Ryley, Carlock & Applewhite by Robert J. Pohlman, Barry R. Sanders & William A. Richards Phoenix, Attorneys for Defendant, Counterclaimant–Appellee.

## OPINION

KLEINSCHMIDT, Judge.

¶ 1   Inter–Tel, Inc., appeals a summary judgment ruling dismissing its suit against Bank of America, with which it once did business.  The trial judge granted summary judgment because he concluded that Inter–Tel had released all claims against the bank. We reverse because there are disputed facts and inferences that raise a jury question as to whether the release was the product of duress.

## FACTS AND PROCEDURAL HISTORY

¶ 2   Inter–Tel, a telecommunications business, had three separate loan agreements with Bank of America:  (1) a thirteen million

dollar line of credit, (2) a five million dollar loan for the purchase and rehabilitation of certain real property known as Los Olivos, and (3) a $990,488 loan for the purchase of certain equipment. These loans were fully secured and cross-collateralized by Inter–Tel's accounts receivable, inventory, equipment, and certain real property.

¶ 3 The bank also did business with Steven G. Mihaylo, the founder, Chairman of the Board, and Chief Executive Officer of Inter–Tel. Mihaylo had borrowed money from the bank personally and had personally guaranteed a loan to a developmental airplane manufacturing company.

¶ 4 In 1989, the airplane company filed for bankruptcy. When Mihaylo could not pay his guaranty and personal loans, his account was transferred to the bank's Special Assets Department. This was the department that attempted to collect non-performing loans.

¶ 5 Mihaylo and the bank tried to work out a settlement. In mid-December 1991, the bank made an offer to Mihaylo and informed him that if an agreement was not reached by the end of 1991, the bank reserved the right to "take any other action the Bank may determine to be appropriate under the circumstances."

¶ 6 While the offer was pending, the bank began the process of transferring Inter–Tel's corporate loan accounts into the Special Assets Department. Mihaylo rejected the offer on January 15, 1992, and made a counteroffer. Approximately two days later, the bank actually placed Inter–Tel's account into the Special Assets Department. Inter–Tel was not informed of the transfer of its account until a week later at a meeting in which the bank also told Inter–Tel that the bank no longer wanted to do business with Inter–Tel. The bank did renew Inter–Tel's account until June 30, 1992.

¶ 7 According to the bank, it placed the Inter–Tel account in the Special Assets Department because its analysis of the telecommunications industry suggested that, while Inter–Tel was in strong financial condition, it could easily be weakened by poor profits or a write-down on the Los Olivos property, which had declined in value and needed environmental cleanup at a cost of two hundred to four hundred thousand dollars.

¶ 8 In fact, in December 1991 Inter–Tel had written down the Los Olivos property by about five million dollars. Inter–Tel's sales were also hundreds of thousands of dollars below its projections. When all things were considered, Inter–Tel had suffered a loss of over four million dollars in 1991.

¶ 9 A loan report prepared by the bank in November 1991 reflected that while the Los Olivos property had been a drag on Inter–Tel's earnings, "the losses are diminishing each year, and the overall company has been profitable for the past five years, with more than sufficient cash flow to service this debt." The bank had concluded that after the write-down on the Los Olivos property, "Inter-tel is expected to still be in compliance with the existing Loan Agreement covenants...."

¶ 10 With respect to the change in net profits, the bank had determined that Inter–Tel still "would have more than sufficient cash flow to cover debt service" and that "[a]ll of [Inter–Tel's] Financial Covenants are in compliance."

¶ 11 In November of 1991, the bank also found that,

[i]n summary, Inter-tel compares favorably to the [telecommunications] industry and seems to understand the direction which needs to be taken to continue to be a strong player in this industry. They have a strong financial statement which will allow them to compete much better than other weaker players in the industry.

¶ 12 In December 1991 Inter–Tel's line of credit had been classified as "satisfactory," which means it was performing as agreed. During the four years that the parties had done business together, Inter–Tel had never been late with a payment, had never suffered a net operating loss, and had always had clean audits.

¶ 13 Enrique Rodriguez, Jr., a former bank officer who had worked in the Special Assets Department and an expert in the banking industry, described the Special Assets Department as solely a collections de-

partment. He could think of no reason why a loan not in default would be placed in the Special Assets Department. Rodríguez said:

Before a single loan, a single relationship that has credit facilities that are not in default and does not require anything other than increased monitoring over a concern over an industry, to send the borrower to special assets is unconscionable because of the consequences. . . .

¶ 14 Rodriguez also said that transferring the Inter–Tel account to the Special Assets Department because of concerns over an industry as a whole, notwithstanding the health of the company, deviated widely from standard banking practices. He stated that a company whose account was placed in the Special Assets Department would rarely be able to find alternative financing.

¶ 15 Inter–Tel had attempted to secure alternative financing from another lender, Sanwa, and in December 1991 was rejected. Sanwa cited three reasons for turning down Inter–Tel: (1) the Los Olivos property, (2) an account receivable that was suspect, and (3) the reference from Inter–Tel's bank. An officer of Sanwa stated that he could not understand why Inter–Tel's account at the bank was only renewed for six months, and he thought he must have been unaware of something about the relationship. He was very concerned about the poor bank reference. The testimony is confusing because Sanwa's officer said that Sanwa rejected the loan in December 1991, which would have been a month before the bank offered Inter–Tel financing for just six months, and before Inter–Tel's account was placed in the Special Assets Department. Possibly, news of the bank's intention to renew was available in December.

¶ 16 In March 1992 the bank informed Inter–Tel that it was making no promise to renew any loans or credit beyond June, and that if the account was renewed it could be under materially different terms. It repeated that if this was a problem, Inter–Tel should seek alternative financing.

¶ 17 In May 1992 Inter–Tel sought financing from Citibank, and on June 16, 1992, its request was rejected as a result of the status of its existing loan at Bank of America. Citibank's rejection came just two weeks before Inter–Tel's credit with Bank of America expired. Inter–Tel then requested a brief extension from Bank of America, and on June 18, 1992, the bank provided a "term sheet" setting forth its requirements for an extension of credit. The bank sent a cover letter with the term sheet stating that the term sheet was to be used to "facilitate negotiations" and did not contain all of the terms of the agreement. The letter also stated that if the parties could not reach an agreement on renewal, the bank would consider extending credit an additional sixty days so that Inter–Tel could refinance the loans with another lender.

¶ 18 On June 22, Inter–Tel faxed an acceptance of the term sheet to the bank. In a Commercial Credit Commitment Report, the bank acknowledged that Inter–Tel had agreed to the term sheet. This report also set forth the terms of the agreement and it did not include a release of all claims Inter–Tel may have had against the bank.

¶ 19 On July 1, with Inter–Tel facing a possible termination of all credit, the bank provided Inter–Tel with what it referred to as the "Fifth Letter Amendment," a formalization of the agreement which included, for the first time, the following release:

In consideration of the execution of this fifth letter amendment by Bank, Borrowers [Inter–Tel] and each of them severally waive any and all claims, causes of action, rights of offset, rights of recoupment, defenses and counterclaims, of any nature, whether known or unknown, matured or unmatured, liquidated or unliquidated, or fixed or contingent: (a) arising out of or related to or against any of the Obligations; (b) against Bank or Security Pacific Bank Arizona or any of their predecessors or successors or past or present agents, officers, employees or attorneys; and (c) based on any occurrences or omissions prior to the Effective Date.

¶ 20 Inter–Tel signed the agreement without objecting to the release provision. According to Ralph Marsh, Chief Financial Officer of Inter–Tel, he was shocked by the inclusion of the release, but he felt that the

company would have been in "dire financial straits" had it not signed the agreement. Marsh, who had consulted Mihaylo about the release, believed that negotiating over the release would have been fruitless and would have only delayed the finalization of the renewal. Considering its financial position, Inter–Tel did not want any further delay.

¶ 21 Sometime in 1992, the bank and Mihaylo reached a settlement regarding Mihaylo's personal indebtedness. According to Mihaylo, the bank's failure to abide by the terms of this agreement resulted in his suing the bank. During the course of Mihaylo's personal litigation, which has since been settled, discovery revealed that the bank had considered placing the Inter–Tel account into the Special Assets Department because of its concerns about Mihaylo's ability to pay his personal indebtedness. Discovery showed that in April 1991 the bank decided to monitor the Inter–Tel account closely and considered whether to downgrade the account to the Special Assets Department if Mihaylo's personal indebtedness worsened. An internal document reflected that the bank had explained to Mihaylo that the Inter–Tel relationship was interwoven with the Mihaylo account and vice versa.

¶ 22 Evidence also showed that Mihaylo and Inter–Tel had been aware of, or at least suspicious as to, why the bank had placed Inter–Tel's account in the Special Assets Department, even though it was not in default. An attorney who did work for Inter–Tel stated that between February and April 1992, Mihaylo had "vented" to him about his troubles with the bank and how it was treating him. Mihaylo felt that Inter–Tel was being squeezed by the bank, and he told the attorney that he thought that by putting Inter–Tel in the Special Assets Department, the bank was trying to put pressure on him to settle his personal debts. According to the attorney, Mihaylo did not think the bank was dealing with him or Inter–Tel in good faith, and Mihaylo thought it "was systematically trying to destroy Inter–Tel and me." Mihaylo also discussed lender liability claims he could bring against the bank in connection with his personal loans.

¶ 23 Mihaylo admitted having "visceral misgivings" as to why Inter–Tel was placed in the Special Assets Department. In notes he had made, he listed the names of two attorneys whom he might call to discuss his misgivings about how the bank was dealing with Inter–Tel. He wanted to discuss issues of liability against the bank which could result from the sale of Inter–Tel stock. Those issues included damage to public shareholders, violations of securities and exchange rules, and interference with Inter–Tel's ability to make a public offering. Although he had these misgivings about the bank, according to Mihaylo he accepted the bank's explanation because of his long-standing relationship with the bank and its representation that it did not have another agenda in placing the corporate account in the Special Assets Department.

¶ 24 In January 1996 Inter–Tel sued the bank alleging breach of the covenant of good faith and fair dealing, breach of contract, fraud by intentional misrepresentation, fraud by nondisclosure, unlawful acts, negligence, interference with prospective business relations, and prima facie tort. After two of the claims had been dismissed, the bank moved for partial summary judgment on all remaining claims and on its counterclaim for a declaratory judgment to establish its rights under the agreement. It argued that Inter–Tel "unambiguously promised in writing that it would not pursue claims against the Bank."

## THE TRIAL JUDGE'S FINDINGS AND CONCLUSIONS

¶ 25 The trial judge found that by signing the release, Inter–Tel had waived its rights to sue the bank. He found that Mihaylo knew enough about the bank's actions when the release was executed to know that he was giving up potential claims. Specifically, Mihaylo knew that the transfer of Inter–Tel to the Special Assets Department did not make sense to him, and he thought the bank was not telling him the truth about why it transferred Inter–Tel's account to the Special Assets Department.

¶ 26 The judge rejected Inter–Tel's argument that it executed the release due to a unilateral mistake as to the bank's reasons

for transferring Inter–Tel's account to the Special Assets Department. He found that Mihaylo believed the bank was not treating Inter–Tel fairly before Inter–Tel executed the release.

¶ 27 The judge also found that the release was not the result of duress or business compulsion. He cited the Restatement of Contracts section 492 for the proposition that the business compulsion doctrine requires a wrongful threat. Although the judge conceded that Inter–Tel had a business necessity for executing the agreement because the loan was about to expire, he found that the bank had never threatened Inter–Tel with default. Rather, it not only offered a six-month extension of the loans but would grant a sixty-day extension so Inter–Tel could try to find another lender if the parties could not come to terms on the six-month extension. The judge concluded that since the bank was under no obligation to extend credit, failing to do so was not wrongful.

### STANDARD OF REVIEW

¶ 28 Since this is an appeal from a summary judgment motion, we review the case de novo. We must determine, taking the evidence in the light most favorable to Inter–Tel, whether a reasonable fact finder could find in its favor. *See Orme Sch. v. Reeves,* 166 Ariz. 301, 306, 802 P.2d 1000, 1005 (1990); *Saenz v. State Fund Workers' Compensation Ins.,* 189 Ariz. 471, 473, 943 P.2d 831, 833 (App.1997).

### INTER–TEL'S ACCEPTANCE OF THE TERM SHEET WAS NOT A BINDING AGREEMENT SO THAT NO ADDITIONAL CONSIDERATION WAS NECESSARY FOR THE RELEASE

■ ¶ 29 Inter–Tel argues that the June 18, 1992, term sheet presented by the bank was an offer, which it accepted on June 22. From that, it argues that since the parties had already agreed to the June 18 term sheet, the July 1 Fifth Letter Amendment with the added release provision was not enforceable without additional consideration.

¶ 30 This argument is easily dealt with. The term sheet was accompanied by a letter stating that the term sheet was to be used to "facilitate negotiations," but was "not meant to be and shall not be construed as a commitment or an attempt to define all of the terms and conditions...." Inter–Tel's acceptance of the term sheet did not create a binding agreement. A reasonable fact finder could not conclude otherwise.

### INTER–TEL WAS NOT OPERATING UNDER A UNILATERAL MISTAKE OF FACT

■ ¶ 31 If one party is operating under a mistake of fact when it signs an agreement, the agreement is voidable if the other party knew or should have known that the first party was mistaken. *Parrish v. United Bank,* 164 Ariz. 18, 20, 790 P.2d 304, 306 (App.1990). Inter–Tel argues that when it signed the release, it was operating under a unilateral mistake of fact—ignorance of the bank's true motive for placing its account in the Special Assets Department. Inter–Tel argues that if it had known the bank's true motives, it would not have signed the release.

■ ¶ 32 A reasonable fact finder could not conclude that Inter–Tel was operating under a unilateral mistake because it had sufficient knowledge of the possible motives of the bank for placing its account in the Special Assets Department when it signed the release. Mihaylo thought the bank was using its relationship with Inter–Tel to put pressure on him to settle his personal indebtedness. His notes indicate he thought the bank was not dealing in good faith, and he thought the bank was systematically trying to destroy him and Inter–Tel. This evidence shows that Inter–Tel, through Mihaylo, its CEO and Chairman of the Board, was aware of the bank's potential motives for transferring the account into the Special Assets Department when it signed the release.

■ ¶ 33 In a closely related argument, Inter–Tel also argues that the bank misrepresented the facts in order to mislead Inter–Tel into executing the release. Mihaylo's assertion as to how his suspicions were supposedly allayed is simply too weak under the

*Orme School* standard to avoid summary judgment on this point.

## THERE IS A DISPUTED QUESTION OF FACT AS TO WHETHER INTER–TEL ACTED UNDER DURESS

¶ 34 Finally, Inter–Tel argues that the release was signed under duress. It claims that the bank wrongfully put its account into the Special Assets Department knowing that it would cause Inter–Tel severe financial hardship and knowing that, because of the bank's action, Inter–Tel would have extreme difficulty finding another lender. Inter–Tel says that when it could not find another lender, it was forced to sign the release of claims in order to stave off financial ruin. For the purposes of summary judgment and this appeal, the bank has conceded that it would be a wrongful act to put Inter–Tel's account into the Special Assets Department for the purpose of pressuring Mihaylo to pay his individual debt.

¶ 35 Arizona follows the Restatement's view of duress. *See Johnson v. American Nat'l Ins. Co.*, 126 Ariz. 219, 225, 613 P.2d 1275, 1281 (App.1980). Section 492 of the Restatement defines duress as

a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or

b) any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising his free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement.

¶ 36 At least one Arizona case expresses the concept more succinctly. In *Frank Culver Elec., Inc. v. Jorgenson*, 136 Ariz. 76, 77–78, 664 P.2d 226, 227–28 (App.1983), we said that duress exists if one party is induced to assent to a contract by a wrongful threat or act of the other party.

¶ 37 Normally, duress does not exist merely because one party takes advantage of the financial difficulty of the other. *See US-*

*Life Title Co. v. Gutkin*, 152 Ariz. 349, 356–57, 732 P.2d 579, 586–87 (App.1986); *Frank Culver Elec., Inc.*, 136 Ariz. at 78, 664 P.2d at 228. It is a different matter, however, when the wrongful act of one party is the very thing that created the other party's financial difficulty. This refinement to the general rule can be inferred from two Arizona decisions. *See Fridenmaker v. Valley Nat'l Bank*, 23 Ariz.App. 565, 572, 534 P.2d 1064, 1071 (1975) (no duress because agreement was not executed to escape duress caused by improper actions of defendant); *Republic Nat'l Life Ins. Co. v. Rudine*, 137 Ariz. 62, 66, 668 P.2d 905, 909 (App.1983) (no economic duress to avoid stipulation, especially since defendants were not responsible for plaintiff's lack of bargaining power).

¶ 38 Courts from other jurisdictions have addressed the issue directly and have found duress where one party's wrongful actions undermined the economic condition of the other. In *International Underwater Contractors, Inc. v. New England Telephone and Telegraph Co.*, 8 Mass.App.Ct. 340, 393 N.E.2d 968 (1979), the plaintiff contracted to install conduits under a river for a specified price. Delays caused by the defendant rendered the price uneconomical and the defendant allegedly promised to make good the difference. The parties could not agree on the amount to be paid, and the plaintiff was suffering financial hardship as a result of not having received any money. It acceded to a take-it-or-leave-it settlement and, in the process, released its claim for the full amount. The plaintiff later sued to recover its full loss, and the trial court granted summary judgment against it on the basis of the release it had given.

¶ 39 The Massachusetts Court of Appeals discussed the law as follows:

The elements of economic duress have also been described as follows: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted *no other* alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 389, 187 Ct. Cl. 15 (1969), cert. denied, 398 U.S. 958, 90

S.Ct. 2164, 26 L.Ed.2d 542 (1970), [citing] *United States v. Bethlehem Steel Corp.* 315 U.S. 289, 301, 62 S.Ct. 581, 86 L.Ed. 855 (1942). "Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion." *Williston,* [Contracts] § 1617, at 708 [ (3d ed.1970) ]. Thus "[i]n order to substantiate the allegation of economic duress or business compulsion ... [t]here must be a showing of acts on the part of the defendant which produced [the financial embarrassment]. The assertion of duress must be prove[n] by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *W.R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir. 1957).

*Id.* at 970. The court reversed the trial court, saying

However, if the assertions of the plaintiff are true, the defendant did more than assert a legal right, as its acts created the financial difficulties of the plaintiff, of which it then took advantage.

*Id.* at 972.

¶ 40 In *In re Consolidated Pretrial Proceedings in Air West Securities Litigation,* 436 F.Supp. 1281 (N.D.Cal.1977), the plaintiff sued to collect additional payments under a purchase contract. It claimed that the defendant's actions rendered it unable to meet one of the conditions of the contract. The court ruled that "[a] claim of coercion is established by a showing that the defendant put plaintiff in a position of financial weakness and then exploited the plaintiff's position by attempting to force plaintiff to relinquish his legal rights." *Id.* at 1290 (citing *Leeper v. Beltrami,* 53 Cal.2d 195, 1 Cal. Rptr. 12, 347 P.2d 12 (1959)). In *Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913 (1971), the plaintiff and defendant had entered into an oral contract that required the plaintiff to transfer his rights in two corporations to the defendant who agreed to pay the plaintiff's debts to creditors. The defendant did not pay the plaintiff's debts, and the plaintiff was threatened with bankruptcy. The parties then entered into a written contract, which lacked some of the key provisions of the oral agreement. Because the defendant had maneuvered the plaintiff into the financial problem he was in, and because the plaintiff's only alternative was bankruptcy, the court voided enforcement of the written contract due to duress. *Id.* at 916–17

¶ 41 Inter–Tel raised a dispute as to whether the bank acted wrongfully by placing its account into the Special Assets Department in violation of standard banking procedures and the covenant of good faith and fair dealing. *See Rawlings v. Apodaca,* 151 Ariz. 149, 153–54, 726 P.2d 565, 569–70 (1986) (a party must refrain from any action that would impair benefits other party had right to expect from contract or relationship). Although the bank proffers proper reasons for placing the account in the Special Assets Department, there is enough evidence of an improper motive to preclude summary judgment. Inter–Tel was not having difficulty paying its debts, and there is evidence that the bank thought Inter–Tel's account was in satisfactory condition. There is evidence that the bank was considering downgrading the account to the Special Assets Department to put pressure on Mihaylo to pay his personal indebtedness. If the bank placed Inter–Tel's account into the Special Assets Department for purposes unrelated to Inter–Tel's ability to pay the debt, and if the bank knew that placing the account in the Special Assets Department would be harmful to Inter–Tel, such conduct could be found wrongful by a reasonable fact finder.

¶ 42 There was also a dispute as to whether Inter–Tel had a reasonable alternative to signing the release of claims. The bank argues that Inter–Tel could have found another lender and that it would have given Inter–Tel a sixty-day extension for that purpose. It argues that these facts require a finding that Inter–Tel was not compelled to accept the Fifth Letter Amendment. However, Inter–Tel presented evidence that showed that two attempts at finding another lender were unsuccessful, partly because of its credit difficulties with the bank. Moreover, its financing had already expired when

it was presented with the release. Taking the facts in the light most favorable to Inter–Tel, we hold that a reasonable finder of fact could conclude that Inter–Tel had to sign the release of claims or end up in default, a condition that might have required it to go out of business. The fact that some months later Inter–Tel did find other financing does not conclusively establish that Inter–Tel had a reasonable alternative when it signed the release.

¶ 43 We have not overlooked the fact that Inter–Tel executed the release without voicing its objection to the bank. While this fact supports the bank's position, it will not justify a summary judgment in the bank's favor.

¶ 44 The order granting summary judgment is vacated, and this case is remanded for further proceedings.

CONCURRING: SHELDON H. WEISBERG, Presiding Judge, REBECCA WHITE BERCH, Judge.